Docket No. 99507.


IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS



JAMES M. YORK, M.D., *et al.*, Appellees, v. RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL CENTER *et al.* (Rush- Presbyterian-St. Luke's Medical Center, Appellant).


*Opinion filed June 22, 2006.*



JUSTICE McMORROW delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Kilbride, and Karmeier concurred in the judgment and opinion.

Justice Garman dissented, with opinion.


**OPINION**

Dr. James M. York suffered a spinal injury during knee replacement surgery performed at defendant Rush-Presbyterian-St. Luke's Medical Center (Rush). As a result, Dr. York (hereinafter, plaintiff) and his wife filed a medical malpractice action in the circuit court of Cook County against the attending anesthesiologist, Dr. Abdel Raouf El-Ganzouri, and Dr. El-Ganzouri's employer, University Anesthesiologists, S.C. Plaintiff alleged that his injuries resulted from the improper administration of a combined spinal epidural anesthesia by Dr. El-Ganzouri prior to the surgery. Specifically, plaintiff alleged that Dr. El-Ganzouri deviated from the standard of care by inserting a needle used to administer anesthesia too high on plaintiff's spine, causing the needle to pierce plaintiff's spinal cord and to result in irreversible spinal injury. Subsequent to the filing of his initial complaint, plaintiff amended his complaint to add Rush as a defendant on the theory that Dr. El-Ganzouri was Rush's apparent agent. After a jury trial, all three defendants were found liable. The jury awarded plaintiff and his wife damages in the amount of $12,598,591.31. The appellate court affirmed the verdict against all defendants. 353 Ill. App. 3d 1.

Thereafter, all three defendants filed petitions for leave to appeal with this court. We granted Rush's petition for leave to appeal, but denied the petition for leave to appeal filed by Dr. El-Ganzouri and University Anesthesiologists. Accordingly, this appeal solely addresses plaintiff's apparent agency claim against Rush. For the reasons that follow, we affirm the judgment of the appellate court.

BACKGROUND

As an initial matter, we note that the record in this cause is voluminous, and that we have carefully reviewed the record in its entirety. The appellate court, in its opinion below, set forth with great detail all of the evidence adduced at trial. However, since the instant appeal is limited to reviewing plaintiff's claim that Rush is liable because Dr. El-Ganzouri was Rush's apparent agent, we do not find it necessary to set forth in detail the evidence presented at trial with respect to the underlying medical malpractice claim against Dr. El-Ganzouri and

University Anesthesiologists. Accordingly, we provide only a brief overview of the facts of the medical malpractice action in order to set the context for plaintiff's claim of apparent agency against Rush.

Plaintiff is a retired orthopedic surgeon. On February 9, 1998, plaintiff underwent a cemented total left knee arthroplasty at Rush. This was the third knee surgery plaintiff had at Rush since 1997, and all three surgeries were performed by Dr. Aaron Rosenberg, an orthopedic surgeon. Upon his admission to Rush for the February 9, 1998, surgery, plaintiff signed a treatment consent form which stated, in pertinent part:

> "I hereby authorize Dr. Rosenberg and such assistants and associates as may be selected by him/her and the Rush-Presbyterian-St. Luke's Medical Center to perform the following procedure(s) upon myself/the patient ***."

During the February 9, 1998, procedure, Dr. El-Ganzouri was plaintiff's attending anesthesiologist, and Dr. Rodney Miller was the anesthesiology resident. Shortly before plaintiff's surgery, Dr. El-Ganzouri administered a combined spinal epidural anesthesia to plaintiff. In this procedure, the anesthesiologist first inserts a large epidural needle–known as a "Touhy" needle–through the skin and between bones in the spine, but short of the spinal column itself. It is generally accepted that the proper location for the insertion of this needle is below the spinal cord, in the lumbar area of the spine, which is at or below the L2-L3 vertebral interspace. By injecting the patient through the lumbar area, the anesthesiologist greatly reduces the risk of the needle making contact with the spinal cord. Once the Touhy needle is properly placed, the anesthesiologist then inserts a much finer needle–known as a "Whittaker" needle–into the center of the larger Touhy needle. The Whittaker needle is advanced through the Touhy needle until the Whittaker needle pierces the dura, which is a thick skin protecting an area known as the subarachnoid space. The subarachnoid space contains cerebral spinal fluid, as well as the spinal cord itself. Once the anesthesiologist pierces the dura, he or she can confirm access to the subarachnoid space by aspirating cerebral spinal fluid back through the inserted

needles. Once the presence of cerebral spinal fluid is confirmed, the anesthesiologist knows that the needles are properly placed and then may inject the anesthesia through the already-inserted needles.

In preparing to insert the Touhy needle into plaintiff's back, Dr. El-Ganzouri located the position on plaintiff's spine where he intended to insert the needle. However, when Dr. El-Ganzouri inserted the first needle into plaintiff's back, plaintiff expressed that he felt excruciating pain in his right hip, knee and leg, and that his right thigh cramped and his right calf swelled. Plaintiff experienced additional severe pain–described as pain radiating down his right leg, resulting in his right leg losing all sensation–when Dr. El-Ganzouri inserted the second needle. Plaintiff then underwent the knee replacement surgery on his left knee.

After the knee surgery, it was discovered that plaintiff had suffered a spinal injury. Plaintiff could neither feel nor move his right leg. In addition, plaintiff had lost bladder and bowel control and also experienced sexual dysfunction. Although plaintiff underwent extensive rehabilitation, he had only partial success in his recovery.

As a result of these events, plaintiff filed a four-count complaint in the circuit court of Cook County on November 17, 1998. Count I of the complaint alleged professional negligence against Dr. El-Ganzouri and University Anesthesiologists, Inc., stating that Dr. El-Ganzouri deviated from the standard of care in administering the combined spinal epidural anesthesia to plaintiff by improperly inserting the needles into plaintiff's spinal cord. Count II of the complaint was filed on behalf of plaintiff's wife, Elizabeth York, and sounded in loss of consortium due to the professional negligence of Dr. El-Ganzouri and his employer, University Anesthesiologists. The remaining two counts of the complaint alleged claims of *res ipsa loquitur* against Dr. El-Ganzouri and University Anesthesiologists. The two counts sounding in *res ipsa loquitur* were subsequently dismissed with prejudice by the circuit court at the conclusion of the trial and are not at issue in this appeal.

On February 7, 2000, plaintiff filed an amended complaint. This amended complaint added Rush as a defendant and alleged:

> "[Dr. El-Ganzouri was] the actual or apparent agent of Defendant, Rush, was mentoring, directing, instructing and teaching various medical students and/or residents and was acting in said capacity, and upon whom plaintiff justifiably and reasonably relied to properly administer anesthesia to the detriment of plaintiff."

The amended complaint pled in the alternative that "defendant Rush failed to inform plaintiff that defendant, Dr. El-Ganzouri, was an independent contractor." The claim of apparent agency was repeated in count II of the complaint, which alleged loss of consortium on behalf of plaintiff's wife.

The jury trial in this case commenced on May 30, 2002. With respect to the underlying medical malpractice action, plaintiff presented medical experts who opined that Dr. El-Ganzouri deviated from the standard of care for anesthesiologists by inserting the spinal needles too high on plaintiff's spine during the combined spinal epidural procedure. Plaintiff introduced evidence that Dr. El-Ganzouri inserted the anesthesia needles at the T12-L1 spinal interspace rather than at the generally recommended L2-L3 spinal interspace. Plaintiff's experts opined that such improper placement of the needles would allow the spinal cord to be pierced, and that the injection of anesthesia directly into the spinal cord would kill nerves and cause the injuries that plaintiff experienced. In contrast, defendants presented medical experts who opined that Dr. El-Ganzouri satisfied the relevant standard of care in performing the combined spinal epidural anesthesia and that plaintiff's injuries were caused by a "spinal infarction"[1] that resulted from a drop in plaintiff's blood pressure during surgery.

With respect to the apparent agency claim brought by plaintiff against Rush, plaintiff argued at trial that Rush was liable for the negligence of Dr. El-Ganzouri. Plaintiff contended

---

[1] Plaintiff's experts defined this term as meaning that the spine was deprived of blood.

that he had not been informed that Dr. El-Ganzouri was an independent contractor and not an employee of Rush. In addition, plaintiff asserted that Dr. El-Ganzouri appeared to be a Rush employee not only based upon the language in the Rush treatment consent form signed by plaintiff, but also by virtue of the fact that Dr. El-Ganzouri wore scrubs and a lab coat that bore Rush insignia. Plaintiff also maintained that he had relied on Rush to provide the anesthesiologist for his surgery.

Rush countered plaintiff's apparent agency claim by asserting that, as a doctor himself, plaintiff could not have reasonably believed that Dr. El-Ganzouri was a Rush employee. Rush argued that, based upon plaintiff's own experience as an independent contractor in the medical profession, he had to have known that Dr. El-Ganzouri was an independent contractor. In addition, Rush denied that plaintiff relied upon Rush to provide an anesthesiologist. Rather, Rush asserted, plaintiff relied upon his son, Dr. Jeff York, to choose the anesthesiologist for his surgery. According to Rush, Jeff, who was an anesthesiology resident at Rush at the time of plaintiff's surgery, was aware that Rush's attending anesthesiologists were independent contractors employed by University Anesthesiologists. Therefore, Rush concluded, it was logical to assume that plaintiff was also aware of the independent-contractor employment status of Dr. El-Ganzouri.

As stated, this appeal revolves around the question of whether plaintiff satisfied his burden of proof at trial to support the jury's verdict that Dr. El-Ganzouri was the apparent agent of Rush. Accordingly, we will set forth in detail the evidence adduced at trial relevant to the apparent agency issue.

Plaintiff testified that he is a retired orthopedic surgeon and that he was 72 years old at the time of trial. Plaintiff stated that he spent 27 years of his career in Somerville, New Jersey, practicing orthopedic surgery at the Somerset Medical Center. Plaintiff testified that during his time at Somerset, he was a self-employed physician and was not employed by the hospital. According to plaintiff, many of the doctors at Somerset–like himself–were solo practitioners, while some other doctors who were on staff there formed practice groups. Plaintiff testified

that he "really didn't know" about the employment relationship between Somerset Medical Center and the anesthesiologists who practiced there. Plaintiff explained: "I had no knowledge. It was none of my business. I was primarily practicing orthopedic surgery. I was not very good with numbers, figures. I let other people do that."

Plaintiff testified that, prior to coming to Rush, he had undergone several knee surgeries, beginning in the 1970s. Plaintiff stated that he handpicked each and every doctor that performed surgery on his knees. In plaintiff's words, he "sought [the doctors] out," and, as a result, he traveled to wherever the chosen surgeon was practicing, whether it was in another city, state, or country. By 1994, however, plaintiff's arthritic knees were getting more and more painful and swollen. At that time, plaintiff initially consulted a doctor in Boca Raton, Florida, near plaintiff's Florida home. Plaintiff, however, did not agree with this doctor's suggested plan of treatment. According to plaintiff, it was then that he asked his son Jeff "to look into Rush." In the following exchange between plaintiff and his counsel, plaintiff explained this process:

"Q. When did you first seek out medical care of any kind at Rush?

A. My son had an orthopedic–I mean, anesthesia residency and he knew I was looking around for somebody to do total knees. And I said, Jeff, can you find out if there's a good man in Chicago, and that's what he did.

Q. And had you known of Rush Pres before that discussion with your son?

A. Yes.

Q. And how did that come about?

A. I played tennis with another doctor *** and he and I were great friends *** [a]nd he was a graduate of Rush Medical School and he was an internist who trained at Rush Medical School, residency.

Q. What was your understanding about Rush then when you spoke with Jeff?

A. I knew there were good docs at Rush.

Q. Did you then eventually hook up with a doctor at Rush to consult with on your knee?

A. Dr. Aaron Rosenberg."

On cross-examination, defense counsel revisited plaintiff's testimony that he had his son Jeff "look into Rush." The following exchange ensued between defense counsel and plaintiff:

"Q. And as I think you mentioned earlier this morning, [Jeff] did that for you?

A. Yes. He said a couple of the orthopedic residents recommended Aaron Rosenberg. I asked a few of my friends about Dr Rosenberg. *** I felt very comfortable going to him.

Q. So you had Jeff check out the orthopedic surgeons at Rush, and then you asked your colleague friend *** about Dr. Rosenberg and–

A. And I asked people in Boca.

Q. You were used to making medical decisions yourself in terms of your own medical care. True?

A. I was used to choosing the surgeon.

Q. Particularly being an orthopedic surgeon, you wanted who you wanted for orthopedic surgery. True?

A. I only knew orthopedic surgery. I had the same trouble the jury has in choosing doctors and other people."

Plaintiff testified that he became a patient of Dr. Rosenberg at Rush in 1994. Plaintiff would make an appointment to see Dr. Rosenberg when plaintiff traveled from his Florida home to Chicago to visit with his son Jeff. According to plaintiff, at the start Dr. Rosenberg had conservatively treated plaintiff's knee problems. However, because of the worsening condition of his knees, plaintiff had to eventually have a replacement of his right knee in August 1997. Plaintiff then underwent a subsequent operation a few days later in September 1997. During this procedure, Dr. Rosenberg removed two plates and screws from plaintiff's left knee that were from a previous operation.

Plaintiff testified he was very pleased with the results from the first knee replacement surgery performed on plaintiff's right knee by Dr. Rosenberg in 1997. As a result, plaintiff went back to Dr. Rosenberg for a surgical replacement of his left knee in February 1998. Plaintiff stated that he would have gone to Dr. Rosenberg for the surgery even if Dr. Rosenberg had moved his practice to a different hospital.

Plaintiff testified that, prior to the left knee replacement surgery scheduled for February 9, 1998, he and his son Jeff discussed the anesthesia care for that procedure. Plaintiff explained this conversation during the following colloquy with his counsel:

> "Q. Now, relative to that operation *** did you and Jeff have any discussion at all about the anesthesia care?
>
> A. We did. I asked him if he could–I had Tom Krolick and Dr. Miller on the first operation and I liked both of them. I had asked Jeff if it was possible to have the same team."

Plaintiff, however, testified that he was not aware how Dr. Krolick was selected to be plaintiff's anesthesiologist for his first knee surgery at Rush.

On cross-examination, defense counsel followed up on plaintiff's testimony regarding the selection of his anesthesiologists during these earlier surgeries. Plaintiff offered additional explanation, as revealed in the following exchange with defense counsel:

> "Q. I think you mentioned that for the first surgery by Dr.Rosenberg, you had Jeff intervene for you to arrange the anesthesiologist, Dr. Tom Krolick; is that right?
>
> A. I believe Jeff said–I said we didn't discuss anesthesia, but he said something about I will pick the anesthesia, I have a friend who owes me a favor, something like that. And Tom Krolick and I hit it off ***."

The colloquy continued:

> "Q. You had asked Jeff then prior to February of '98 to see if he could get both Tom Krolick and Rodney Miller for your February 9 procedure?

A. Yeah. When you come up from Florida to a big city, its nice to see one person you know in the operating room. I liked Rodney Miller."

According to plaintiff, he subsequently found out that Dr. Krolick was not available for the February 9, 1998, surgery because he was scheduled to be out of the office that day. However, as plaintiff requested, Dr. Miller was assigned to his surgery as the anesthesiology resident. According to plaintiff, he was unaware prior to his surgery who the attending anesthesiologist would be. Plaintiff explained this during the following exchange with his counsel:

"Q. By the way, did you know Dr. El-Ganzouri was going to be your doctor anesthesiologist that day?

A. No I didn't.

Q. Who did you think it was going to be?

A. I really didn't know.

Q. And upon whom did you rely, if anyone, for the selection of an anesthesiologist?

A. I assumed Rush was going to select them. They have good docs at Rush. I knew that. I had two surgeries there."

On cross-examination, defense counsel further inquired of plaintiff about the anesthesiology services he received during the prior operations on his knees. Plaintiff testified that in those procedures, he relied upon either the "orthopedic surgeon and/or the hospital I was going to" to select the anesthesiologist for the surgery. According to plaintiff, this reliance was based upon his "faith in the institutions."

Plaintiff's son, Dr. Jeff York, also testified at trial. Jeff stated that in February 1998 he was employed by Rush as a resident in its anesthesiology training program. Jeff testified that he began his anesthesia residency at Rush in 1994 and completed it in 1998. As a result of his residency there, Jeff stated, he "thought highly of Rush." According to Jeff, when his father first asked him in 1994 about the quality of care that he would receive at Rush, Jeff told his father that he was "enthusiastic about the services and nursing staff, doctors and postoperative care that he could receive." Jeff testified that he

˘10˘

"spoke highly of Rush and encouraged [his father] to come to the hospital for medical care."

Jeff further explained his enthusiasm about his father's being treated at Rush in the following colloquy between Jeff and plaintiff's counsel:

"Q. I would like you to tell the ladies and gentlemen of the jury about your initial conversation with your father about possibly coming to Chicago, Rush-Presbyterian-St. Luke's for treatment.

A. I was very enthusiastic about my father to come to Rush-Presbyterian-St. Luke's Medical Center for medical care. I had good knowledge of the surgeons, the nursing staff, and the postoperative care that could be given to patients as I was a resident in the anesthesia training program there.

I encouraged him to come to Rush-Presbyterian-St. Luke's Medical Center because I thought that he could get–that he could receive good care there.

Q. Dr. York, will you tell us when you first discussed Dr. Rosenberg with your father in context of his conversation and contact with you about Rush?

A. I was encouraging my father to come to Rush-Presbyterian-St. Luke's Medical Center for surgical care.

Q. When did you talk to your father about Dr. Rosenberg?

A. I did some research asking individuals about the quality of orthopedic surgeons on staff at Rush-Presbyterian-St. Luke's Medical Center. And I tried to find out which surgeon did the most total knees and who had the best results. And then encouraged my father to come to Rush for surgical care."

Jeff testified that his father traveled from Florida to see Dr. Rosenberg for treatment from 1994 to 1997. In August 1997, his father underwent the first surgery by Dr. Rosenberg on his right knee. For that surgery, Dr. Krolick–a member of University Anesthesiologists–was the attending anesthesiologist. Jeff testified that after the August 1997 surgery, his father was

pleased with the results. Nine days later, his father had a surgical revision performed on his left knee by Dr. Rosenberg. Dr. Sklar was the attending anesthesiologist for that procedure. According to Jeff, his father was also pleased with the results of the second surgery. Jeff testified that Jeff's friend Dr. Rodney Miller had been the anesthesiology resident assigned to these first two surgeries.

With respect to the February 1998 surgery at issue in the instant cause, Jeff stated that he was aware prior to that surgery that Dr. Miller would be the resident anesthesiologist assigned to his father's case. Jeff further testified, however, that he had no contact with any of his father's other physicians or anesthesiologists prior to that surgery. Jeff testified that he did not know which attending anesthesiologist would be assigned to his father's surgery, as revealed by the following colloquy between Jeff and defense counsel on cross-examination:

>"Q. *** And you were aware before Monday of February 9th that Dr. Miller would be doing your father's case come Monday?
>
>A. Yes.
>
>Q. And you were aware that your father specifically asked for Dr. Miller to be assigned to his case?
>
>A. He had shown a preference to Rodney Miller because he gave him good anesthetic care previously.
>
>Q. And when you found out that Dr. El-Ganzouri had been assigned to your father's case for that Monday, February 9th, you voiced no objection to that assignment, is that right?
>
>A. I wasn't aware that Dr. El-Ganzouri had been assigned to my father's case for Monday.
>
>Q. Is it correct that when you learned that Dr. El-Ganzouri would be the anesthesiologist for your father's case on the 9th of February, that you did not voice any opposition to that?
>
>A. I wasn't aware that Dr. El-Ganzouri was going to be my father's anesthesiologist for that coming Monday, that coming operation."

Jeff testified that, during the time period in which his father's surgery occurred, anesthesiologists at Rush were assigned to surgical cases based upon their seniority and their specialty track. For example, an anesthesiology resident who was undergoing a certain type of training would be assigned to a certain type of case. The attending anesthesiologists would be assigned in the same manner.

Jeff testified that the scheduling or assignment of anesthesiologists at Rush was generally handled by Ray Narbone. Narbone was a nurse anesthetist and an employee of Rush. According to Jeff, Narbone would review a daily list of the available anesthesiology staff and would assign certain residents and attending anesthesiologists to a particular case for that day. Jeff testified that patients did not select their anesthesiologists at Rush.

Jeff stated that the first contact that a patient has with the Department of Anesthesia prior to surgery is with someone from the resident staff, who would be responsible for meeting the patient in the surgical holding area. During this pre-anesthesia evaluation, Jeff testified, there was no discussion of the employment relationship between the anesthesia physicians and the patient. Jeff further testified that at the time of his father's February 1998 surgery, all the anesthesiologists–both attending and residents–wore green scrubs with the Rush logo printed on them. Outside of the surgical setting, the attending anesthesiologist would wear a white lab coat with the Rush logo on the pocket.

Jeff concluded his testimony by stating that the offices of University Anesthesiologists are located in a Rush building and, at the time of his father's February 1998 surgery, all of the attending anesthesiologists at Rush were members of University Anesthesiologists. According to Jeff, he had no conversations with his father about University Anesthesiologists prior to his father's surgery. Jeff stated that for his February 1998 surgery, his father indicated no preference for any attending anesthesiologist on staff. Jeff stated that he–and not his father–requested that Dr. Krolik serve as the attending anesthesiologist for that surgery.

Dr. Rodney Miller also testified at trial. Dr. Miller stated that he participated as an anesthesia resident in plaintiff's 1997 knee surgeries at Rush. Dr. Miller stated that he also served as the anesthesiology resident during plaintiff's February 9, 1998, surgery because plaintiff and his son, Dr. Jeff York, "requested" Dr. Miller to participate. According to Dr. Miller, plaintiff and his son Jeff had also requested Dr. Krolick to serve as the attending anesthesiologist for the February 9, 1998, surgery. However, Dr. Krolick was not available on that day for surgery. Instead, Dr. El-Ganzouri was assigned to plaintiff's case as the attending anestheologist.

With respect to the events occurring on the day of plaintiff's surgery, Dr. Miller testified as follows:

> "Q. In *** the morning of February 9, 1998, did you see [plaintiff]?
>
> A. Yes.
>
> Q. Describe for the ladies and gentlemen of the jury where that would have been.
>
> A. That was in the holding area. I believe it was bed 24 or 25. That's where I saw him.
>
> Q. Okay. Did you learn that morning who the attending anesthesiologist would be that you would be working with?
>
> A. It was scheduled to be with Dr. Krolick; but he was unavailable at the time, so there was a last minute–Basically, Dr. Krolick was unavailable, so Dr. [El-]Ganzouri was the next available doctor and he ended up doing the case instead of Dr. Krolick.
> ***
>
> Q. After you learned that Dr. El Ganzouri was I think you described the next available anesthesiologist, whatever you said–
>
> A. Yeah.
>
> Q. – did you then go to [plaintiff] and discuss him–discuss that with him to seek his approval or acquiescence?
>
> A. Yes.

Q. Do you remember what you told him?

A. I just told him that there has been a change. Dr. Krolick is not available and Dr. [El-]Ganzouri will be doing the anesthesia.

Q. Okay. Did [plaintiff] participate at all in the selection of Dr. El-Ganzouri to your knowledge?

A. No."

Raymond Narbone also testified at trial as an adverse witness called by plaintiff. Narbone testified that at the time of plaintiff's February 9, 1998, surgery, Narbone was Rush's director of Operating Services and Chief Anesthetist-Anesthesiology. Narbone stated that his desk was located in the offices of University Anesthesiologists, and that the offices of University Anesthesiologists are located within one of the Rush's buildings. According to Narbone, 50% of his salary was paid by Rush and 50% of his salary was paid by University Anesthesiologists. Narbone, however, testified that he considers himself to be an employee of Rush.

According to Narbone, his job was to schedule cases for attending and resident anesthesiologists and to decide in which operating room the surgeries would take place. Narbone testified that he did the preliminary scheduling for plaintiff's February 9, 1998, surgery. Narbone explained that this means that he paired up an attending anesthesiologist with a resident anesthesiologist and then assigned this pair to an available operating room. Narbone also stated that in making up the schedule, he would take into consideration requests for assignments. Once Narbone completed the preliminary scheduling, he would then give the schedule to the clinical coordinator for University Anesthesiologists for final approval.

Narbone testified that the scheduling process for a Monday surgery–as plaintiff had in the matter before us–starts on Friday afternoon. There is a schedule of surgeries that are to be performed, and also a schedule of persons available for that day. Narbone would assign the attending anesthesiologists and match them, as best he could, with the residents in their proper rotation. He also would take into consideration any special requests. Counsel for plaintiff then asked Narbone whether he

would make any notation on the scheduling sheets to remind himself about such special requests. The following colloquy then occurred between the witness and counsel:

"Q. And then finally, the records–you have some kind of records that you keep there, right, a sheet you make up?

A. I don't make it up. The scheduling secretary makes it up.

\*\*\*

Q. And the sheet does track phone calls and stuff, though, doesn't it?

A. No.

Q. Does it track communications about requests?

\*\*\*

A. It tracks certain notations that I need to take into consideration when making out the schedule. It varies from all kinds of communications \*\*\*.

Q. And that's the spot \*\*\* you would have expected if there was a phone call or a meeting for a notation to have been made about a meeting with Jeff York or a request by Jeff York and its not there?

A. No, not necessarily. I often get requests. People come up to me in the operating room or they will call me or something and say, you know, my sister, my brother, or what have you is having surgery, can you assign X to it?

Q. But when you do make a notation, that is where the notation is made?

A. No. I don't make that notation.

Q. Who would make that notation?

A. Our scheduling secretary.

Q. So then you never make a notation. Is that what you are telling us?

A. Well, maybe to myself."

Narbone further testified that with respect to plaintiff's February 9, 1998, surgery, Narbone selected Dr. Miller to serve

˘16˘

as the anesthesiology resident. Narbone testified that Dr. Miller was assigned to plaintiff's orthopedic surgery, even though Miller was on an advanced general surgery rotation, because Dr. Miller was "requested to do the case" by plaintiff's son Jeff. Narbone stated that "[Dr. Miller] and Dr. [Jeff] York were pretty close friends as residents and Dr. Miller had done the previous surgeries that I recall."

It was also Narbone's recollection that on the Friday prior to plaintiff's Monday surgery, Narbone was aware that Dr. Krolick would not be available to serve as plaintiff's attending anesthesiologist because Dr. Krolick was scheduled to be out of the office on that Monday. It was at that time that Narbone made a preliminary assignment of Dr. El-Ganzouri to be the attending anesthesiologist on plaintiff's case. Narbone testified that he did not make the decision to assign Dr. El-Ganzouri to plaintiff's case on his own. Rather, Narbone believed that plaintiff's son Jeff had requested that Dr. El-Ganzouri be assigned to plaintiff's case as the attending anesthesiologist.

The following exchange occurred between plaintiff's counsel and Narbone with respect to Narbone's recollection of the assignment of anesthesiologists to plaintiff's February 1998 surgery:

"Q. You believe that in this particular circumstance, that you did pick Rodney Miller to be the resident? True?

A. Correct.

Q. Correct?

A. Correct.

Q. And you also believe based upon a phone conversation, that you cannot give us any detail about, that Jeff York requested Dr. El-Ganzouri for his dad. Isn't that what you believe?

A. I believe that it was requested. Whether it was by phone or not, I can't be certain.

Q. Just so we are clear and have in context your memory, you have absolutely no memory of any kind whatsoever about a conversation over the phone or in person with Jeff York?

˘17˘

A. Not specifically.

Q. And you base your entire belief that he made the request for Dr. El-Ganzouri on the fact that that's what happens virtually all the time when a family member is being operated on?

A. Yes."

However, Narbone also testified that "he [knew] for certain" that plaintiff himself had not made the request for a specific attending anesthesiologist directly to Narbone or anyone that Narbone knew of.  Plaintiff also introduced the videotape deposition testimony of Dr. Catherine Wilson, who was plaintiff's treating psychologist during his stay from February to March 1998 in the spinal cord injury unit at the Rehabilitation Institute of Chicago. Dr. Wilson testified that, initially upon his arrival at the Rehabilitation Institute, she wrote a progress note wherein she recorded that plaintiff was extremely angry and cried a lot. Dr. Wilson explained that plaintiff was very angry at the medical profession and with his son, Jeff, as a result of the occurrences during his February 9, 1998, surgery. According to Dr. Wilson, plaintiff had a feeling of being let down by the medical profession, and no longer trusted that profession. In addition, Dr. Wilson stated that plaintiff was upset with his son because he felt his son did not do the things he said he was going to do, particularly that Jeff did not call him back about the anestheologist.

Defendant, Dr. El-Ganzouri, also testified at trial. Dr. El-Ganzouri was first called by plaintiff as an adverse witness, and then testified on his own behalf in defendants' case in chief.

Dr. El-Ganzouri testified that he was the clinical director of the Rush Department of Anesthesiology from June 1980 until 2000. At that time, he decided to leave administrative work and to concentrate on clinical work and teaching. At the time of trial, Dr. El-Ganzouri was an associate professor of anesthesiology at Rush and a senior attending anesthesiologist.

Dr. El-Ganzouri testified that, prior to 1980, the anesthesiologists practicing at Rush were employees of Rush hospital. However, when University Anesthesiologists was

˘18˘

formed in 1980, the doctors affiliated with that practice group became independent contractors. Dr. El-Ganzouri stated that the offices of University Anesthesiologists were located within one of Rush's buildings. Dr. El-Ganzouri stated that Ray Narbone, an employee of Rush, assisted University Anesthesiologists' clinical coordinators in making preliminary scheduling assignments. According to Dr. El-Ganzouri, once Ray Narbone had made up the initial clinical schedule, that schedule was then approved by a clinical coordinator working for University Anesthesiologists.

Dr. El-Ganzouri testified that during the times he was in the operating room, he would wear scrubs covered with the Rush logo. Dr. El-Ganzouri explained that everyone who works in the operating room wears these types of scrubs. Dr. El-Ganzouri also stated that, when he was not in the operating room, he would wear a white lab coat with a Rush logo. Dr. El-Ganzouri testified that it was common at Rush for doctors not employed by the hospital to wear such lab coats with the Rush insignia. Dr. El-Ganzouri stated that he did not know what, if anything, plaintiff knew about whether he worked for Rush or whether he was an independent contractor employed by University Anesthesiologists. According to Dr. El-Ganzouri, he would not, in the normal course of events, tell a patient that he worked for University Anesthesiologists as an independent contractor and was not an employee of Rush.

Dr. El-Ganzouri further testified that on the day of plaintiff's February 1998 surgery, he was the attending anesthesiologist and Dr. Rodney Miller was the resident anesthesiologist assigned to the case. Dr. El-Ganzouri stated that he met plaintiff for the first time in the surgical holding area around 7 a.m. on the morning of the surgery. According to Dr. El-Ganzouri, when he received the assignment, it was the first time he knew plaintiff was going to be his patient.

Dr. El-Ganzouri testified that, although he had never before met plaintiff, plaintiff knew him. When Dr. El-Ganzouri introduced himself to plaintiff shortly before the surgery on February 9, plaintiff said, "I know you. You are the one who teaches my–Jeff my son, fiberoptic and you are famous for this."

Defendant also submitted for consideration by the jury the videotape evidence deposition of Dr. John Glesmann. Dr. Glesmann, who lived in New Jersey at the time of trial, was the retired department director of anesthesia at Somerset Hospital in Somerville, New Jersey. Dr. Glesmann knew plaintiff from 1965 until 1991, during the time plaintiff practiced at Somerset Hospital as an orthopedic surgeon. Dr. Glesmann was an anesthesiologist who worked with plaintiff once or twice per week in the operating room and who also saw plaintiff at social occasions.

The witness testified that during the 47 years he practiced at Somerset, he was self-employed. In fact, according to Dr. Glesmann, all of the anesthesiologists at Somerset Hospital were self-employed, performed their services on a fee-for-service basis, and billed the patients directly for their services.

On cross-examination, Dr. Glesmann testified that typically, during his time as head of the anesthesiology department at Somerset, the assignment of anesthesiologists to cases was made by someone from the hospital, although he tried to honor specific requests from patients. It was his experience that the majority of cases were randomly assigned. Dr. Glesmann acknowledged that every hospital has a different way of handling assignment of cases and compensation for physicians. Dr. Glesmann noted that Somerset Hospital was a small institution and admitted that at some of the larger teaching institutions he was aware that some anesthesiologists were paid by the hospital itself.

At the close of evidence, Rush moved for a directed verdict on the issue of apparent agency in its favor and against plaintiff. Rush argued that plaintiff failed to prove both the holding out and reliance elements required to succeed on an apparent agency claim. Rush argued that the evidence presented at trial, taken in the light most favorable to plaintiff, so overwhelmingly favored Rush that no contrary verdict based upon that evidence could stand.

The circuit court denied Rush's motion for a directed verdict. In the course of its ruling, the circuit court noted that there was no evidence presented that plaintiff signed a consent form advising him that the anesthesiologists at Rush were

independent contractors and not employed by the hospital. The circuit court held that, based upon the evidence presented, a jury could reach a decision that plaintiff relied upon Rush. The circuit court did, however, comment that the case law on the apparent agency issue was "confusing" and unsettled.

Thereafter, the parties tendered to the circuit court jury instructions. Relevant to this appeal, the trial court adopted plaintiff's tendered jury instruction on apparent agency, which was based upon Illinois Pattern Jury Instructions, Civil, No. 105.10 (Supp. 2003) (hereinafter IPI Civil (Supp. 2003).

> "Under certain circumstances, the liability of a party may arise from an act or omission of that party's apparent agent. In the present case, James York, M.D. and Elizabeth York have sued Rush Presbyterian St. Luke's Medical Center as the principal and Abdel Raouf El-Ganzouri, M.D. as its apparent agent. Rush Presbyterian St. Luke's Medical Center denies that any apparent agency relationship existed.
>
> In order for an apparent relationship to have existed, James York, M.D. and Elizabeth York must prove the following:
>
> First, that Rush Presbyterian St. Luke's Medical Center held itself out as a provider of anesthesia services and that James York, M.D., neither knew nor should have known that Abdel Raouf El-Ganzouri, M.D. was not an employee of Rush Presbyterian St. Luke's Medical Center.
>
> Second, that James York, M.D. did not choose Abdel Raouf El-Ganzouri M.D. but relied upon Rush Presbyterian St. Luke's Medical Center to provide anesthesia services."

The circuit court refused to tender to the jury an alternative instruction submitted by Rush. Rush's proffered instruction was identical to that given to the jury, except for providing that plaintiff was to prove that Rush held itself out as a provider of "complete" anesthesia services and that plaintiff "or others" did not choose Dr. El-Ganzouri.

On June 13, 2002, the jury returned a verdict in favor of plaintiff, and against all three defendants–including Rush. The jury awarded damages in the amount of $11,598,591.31 to plaintiff, and awarded plaintiff's wife $1 million for loss of consortium.

On August 14, 2002, Rush filed a posttrial motion requesting that the circuit court vacate the jury's verdict in favor of plaintiff, and enter judgment notwithstanding the verdict (judgment *n.o.v.*) in favor of Rush. Rush asserted that it was entitled to judgment *n.o.v.* on the basis that the evidence at trial failed to establish that plaintiff selected Rush and accepted the services of the anesthesiology group because plaintiff believed that attending anesthesiologists were employed by Rush and because that fact was important to him. In addition, Rush requested that the circuit court grant it a new trial on the basis that the apparent agency instruction tendered to the jury was faulty for two reasons: the instruction not only failed to clarify that the jury was required to find that plaintiff relied on Rush to provide "complete" anesthesia care, but also failed to inform the jury that if it believed that plaintiff's son Jeff selected Dr. El-Ganzouri as plaintiff's attending anesthesiologist, then the jury could have returned a verdict for the hospital.

The circuit court held a hearing on Rush's posttrial motion on November 19, 2002. On December 19, 2002, the trial court entered an order denying the posttrial motion. Rush filed its notice of appeal on January 17, 2003.

The appellate court affirmed the judgment of the circuit court. 353 Ill. App. 3d 1. Because of the limited nature of this appeal, we focus only upon those portions of the appellate court opinion relevant to the specific issue of Rush's liability on the basis of apparent agency.

In the appellate court, Rush argued that the circuit court erred by refusing to grant Rush judgment *n.o.v.* or, in the alternative, a new trial. According to Rush, the evidence adduced at trial led to the conclusion that plaintiff could not have reasonably believed that Dr. El-Ganzouri was a hospital employee and, therefore, that plaintiff did not rely on Rush to provide the attending anesthesiologist for his February 9, 1998, knee surgery.

The appellate court observed that this court, in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993), set forth a three-part test for determining whether a hospital may be held liable under an apparent agency theory for the actions of an independent doctor working in its facility. Rush, however, argued that this court's subsequent decision in *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208 (1996), which addressed the issue of apparent agency in the context of a slip-and-fall accident at a restaurant, was intended by this court to alter the *Gilbert* analysis. Rush asserted that, after *O'Banner*, in order for liability to attach to a hospital in a medical malpractice case involving an independent doctor, the plaintiff must prove that a representation of the hospital induced him to come to that hospital in the first instance. The appellate court disagreed.

The appellate panel noted that there has been a split in decisions rendered by our appellate court with respect to claims based upon the theory of apparent agency in medical malpractice actions. In support of its position, Rush relied on the decisions in *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508 (2000), and *James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627 (1998), wherein the courts held that the plaintiffs failed to satisfy the reliance element of their apparent agency claims. In opposition to Rush's argument, plaintiff relied upon the rulings in *McCorry v. Evangelical Hospitals Corp.*, 331 Ill. App. 3d 668 (2002), and *Scardina v. Alexian Brothers Medical Center*, 308 Ill. App. 3d 359 (1999), wherein the courts held that the plaintiffs sufficiently established reliance. The appellate court below determined, however, that it did not have to choose between these cases, as "our supreme court has already made the decision for us, in favor the of the reasoning of *Scardina* and *McCorry* in *Gilbert.*" 353 Ill. App. 3d at 27.

The appellate court held that "those cases that have sought to incorporate the holding of *O'Banner* into the medical malpractice context have analyzed their cases with the wrong focus." 353 Ill. App. 3d at 29. The appellate court reasoned that, under *Gilbert*, when a patient relies on a hospital for the provision of support services, even when a physician specifically selected for the performance of a procedure directs

the patient to that particular hospital, there may be sufficient reliance under the theory of apparent agency for liability to attach to the hospital should the supporting physician commit malpractice.

The appellate court held that there was no inconsistency between this approach and the holding in *O'Banner.* In support of this conclusion, the appellate court noted that the Illinois Supreme Court Committee on Pattern Jury Instructions in Civil Cases highlighted the unique dynamic between doctor and patient in the hospital setting when it explained that its instruction for apparent agency in medical malpractice cases "should not be used without modification where apparent agency is alleged in contexts other than medical negligence," and then cited to *O'Banner.* IPI Civil (Supp. 2003) No. 105.10, Notes on Use, at 27. 353 Ill. App. 3d at 30. The appellate court noted that that same committee also observed that [a] pre-existing physician-patient relationship will not preclude a claim by the patient of reliance upon the hospital." IPI Civil (Supp. 2003) 105.10, Comment, at 27, citing *Malanowski v. Jabamoni*, 293 Ill. App. 3d 720, 727 (1997). 353 Ill. App. 3d at 30.

The appellate court explained that, unlike the scenario in *O'Banner*, where the plaintiff's contact with the injury-causing instrumentality at the defendant's place of business could have come about through nothing more than mere happenstance, in cases such as that at bar, a plaintiff comes into contact with the injury-causing instrumentality–a negligent doctor–because he relies on the hospital to provide a physician. The appellate court further stressed that there is no injustice in this imposition of vicarious liability. As the *Gilbert* court pointed out, hospitals advertise themselves as centers for complete medical care and reap profits when competent service is provided by the independent doctors in their facilities. Additionally, the appellate court reasoned that its holding would encourage hospitals to provide better supervision and quality control over the independent physicians working in their facilities. In sum, the appellate court held that there was sufficient supporting evidence to sustain the verdict in favor of plaintiff.

Rush further argued on appeal that the circuit court erroneously instructed the jury on the apparent agency issue.

The appellate court observed that whether to provide a particular jury instruction is within the sound discretion of the trial court, and the court's decision will be reversed only in the event of an abuse of that discretion. In this case, the circuit court admonished the jury using IPI Civil (Supp. 2003) No. 105.10. The appellate court rejected Rush's argument that the instruction, as given, did not accurately reflect the law.

Rush argued, *inter alia*, that the instruction tendered by the circuit court to the jury was erroneous because the court refused to allow Rush to add the phrase "or others" to the relevant portion of the pattern instruction: "[T]hat [plaintiff] *or others* did not choose Abdul Raoul El-Ganzouri M.D. but relied upon Rush Presbyterian St. Luke's Medical Center to provide anesthesia services." (Emphasis added.) The appellate court observed that Rush's proposed addition of the "or others" language derived from the notes to the pattern instruction, which explain that the phrase should be used "where there is evidence that a person or persons other than the plaintiff or the decedent relied upon the principal to provide the medical care under consideration." IPI Civil (Supp. 2003) No.105.10, Notes on Use, at 27. The appellate court rejected Rush's argument that the omission of the "or others" language was an abuse of discretion. The appellate court acknowledged that Rush did present evidence, direct and circumstantial, that plaintiff relied on his son, Dr. Jeff York, to procure his anesthesiologist, and this would have justified the inclusion of the "or others" language in the instruction. However, contrary to Rush's assertion, the jury's consideration of Dr. Jeff York's potential involvement in the choice of anesthesiologists was not precluded under the given instruction. The appellate court held that, under the given instruction, plaintiff had to prove not only that he did not choose Dr. El-Ganzouri to be his anesthesiologist, but also that he, instead, had relied on Rush. Under the given instruction, had the jury believed that plaintiff had relied on Dr. Jeff York, and not Rush, it still could have returned a finding of no liability. Thus, the appellate court determined that the jury was fairly apprised of the law under the instruction it received.

˘25˘

We granted Rush's petition for leave to appeal. 177 Ill. 2d R. 315(a). The Illinois Hospital Association and the Metropolitan Healthcare Council were granted leave to file an *amicus curiae* brief in support of Rush. In addition, Advocate Health Care was also granted leave to file an *amicus* brief on behalf of Rush. Finally, we granted the Illinois Trial Lawyers Association (ITLA) leave to submit an *amicus curiae* brief in support of plaintiff.

## ANALYSIS

In its appeal to this court, Rush asserts that plaintiff adduced insufficient evidence at trial to establish Rush's vicarious liability under the doctrine of apparent agency for the negligent actions of Dr. El-Ganzouri. Accordingly, Rush contends, the circuit court was required to enter judgment *n.o.v.* in favor of Rush or, in the alternative, grant Rush a new trial. Rush further asserts that the appellate court erred in affirming the circuit court's denial of Rush's posttrial motions. We begin our review of Rush's claims by setting forth the standards for granting each of these two forms of relief.

A judgment *n.o.v.* should be granted only when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). In other words, a motion for judgment *n.o.v.* presents "a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the plaintiffs, there is a total failure or lack of evidence to prove any necessary element of the [plaintiff's] case." *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 311 (1942). Because the standard for entry of judgment *n.o.v.* "is a high one" (*Razor v. Hyundai Motor America*, No. 98813, slip op. at 21 (February 2, 2006)), judgment *n.o.v.* is inappropriate if "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995). A court of review "should not usurp the function of the jury and substitute its judgment on questions

of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way. [Citations]." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992). We review *de novo* the circuit court's decision denying defendant's motion for judgment *n.o.v. McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

A new trial should be granted only when the verdict is contrary to the manifest weight of the evidence. *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976). A verdict is contrary to the manifest weight of the evidence when the opposite conclusion is clearly evident or when the jury's findings prove to be unreasonable, arbitrary and not based upon any of the evidence. *McClure*, 188 Ill. 2d at 132, quoting *Maple*, 151 Ill. 2d at 454, quoting *Villa v. Cown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1089 (1990). A reviewing court will not reverse a circuit court's decision with respect to a motion for a new trial unless it finds that the circuit court abused its discretion. *Maple*, 151 Ill. 2d at 455. We are mindful that credibility determinations and the resolution of inconsistencies and conflicts in testimony are for the jury. See *People v. Rodriguez*, 291 Ill. App. 3d 55, 66 (1997).

With the above-described procedural framework in mind, we turn to the merits of the instant appeal. This court first applied the apparent agency doctrine in a medical malpractice context in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993). In *Gilbert*, we addressed the question of whether a hospital may be held vicariously liable for the negligence of a physician who is not an employee of the hospital but who, rather, is an independent contractor. We held that a hospital may be vicariously liable under such circumstances pursuant to the doctrine of apparent agency. Although the parties in the instant cause do not dispute that *Gilbert* applies to the facts before us, the parties do, however, vigorously disagree as to how the *Gilbert* decision should be interpreted and whether this court's subsequent opinion in *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208 (1996), altered our holding in *Gilbert*.

In *Gilbert*, plaintiff's decedent suffered chest pains and was taken by ambulance to the defendant hospital and admitted to the emergency room. In the hospital's emergency room,

decedent signed a consent form prepared by the hospital which stated, in pertinent part:

> " 'The undersigned has been informed of the emergency treatment considered necessary for the patient whose name appears above and that the treatment and procedures will be performed by physicians and employees of the hospital. Authorization is hereby granted for such treatment and procedures.' "
> *Gilbert*, 156 Ill. 2d at 516.

The defendant hospital was a full-service, acute-care facility, having an active staff of 14 to 20 physicians. Many of these physicians, however, practiced through professional organizations, and the hospital considered them to be independent contractors, including those who practiced in the emergency room. *Gilbert*, 156 Ill. 2d at 514-15. The hospital emergency room, however, in all other respects was considered to be a "hospital function," wherein the hospital employed the emergency room nurses and owned the emergency room equipment. *Gilbert*, 156 Ill. 2d at 515-16. The physicians billed emergency room patients separately for their services, while the hospital billed the emergency room patients for the remainder of the expenses. *Gilbert*, 156 Ill. 2d at 516. The evidence showed that the hospital did not advise emergency room patients that emergency room physicians were independent contractors rather than hospital employees. *Gilbert*, 156 Ill. 2d at 516.

Decedent was examined in the emergency room by Dr. Frank, a physician affiliated with Kishwaukee Medical Associates, Ltd. (KMA). *Gilbert*, 156 Ill. 2d at 516-17. Decedent had requested to be examined by Dr. Stromberg, another KMA physician. However, Dr. Stromberg's call that day was covered by Dr. Frank, who had never before met decedent. Dr. Frank administered several tests to decedent, none of which revealed any sign of heart disease or a heart problem. Accordingly, Dr. Frank released decedent to return home. Later that evening, decedent died as a result of a heart attack. An autopsy revealed the presence of heart disease at the time of his death.

Thereafter, plaintiff, as special administrator of decedent's estate, brought a medical malpractice and wrongful-death

action against Dr. Frank and the hospital. The claim against the hospital alleged that the hospital, through its agents and employees–including Dr. Frank–negligently failed to perform various acts in relation to the diagnosis and treatment of decedent. The hospital moved for summary judgment, contending that Dr. Frank was neither the agent nor the employee of the hospital. The circuit court granted summary judgment in favor of the hospital, holding that the hospital could not be held vicariously liable because Dr. Frank was an independent contractor. On appeal, a majority of the appellate court affirmed. This court reversed and remanded for further proceedings. We held a genuine issue of material fact existed as to whether the physician was acting as the hospital's apparent agent.

In *Gilbert*, the hospital asserted that it could not be vicariously liable for the alleged negligent conduct of Dr. Frank because he was neither an employee nor an agent of the hospital. We rejected this argument, noting that it had already been established under prior case law that a hospital could be liable in a medical malpractice action based upon a principal-agent relationship between the hospital and the physician. *Gilbert*, 156 Ill. 2d at 518. However, at the time *Gilbert* was decided, there was a split in the appellate court with respect to the extent of agency required to impose liability: in some decisions, the appellate court held that a hospital could be vicariously liable for the negligence of a physician who was the *apparent* agent of the hospital. In other decisions, the appellate court had refused to impose vicarious liability upon a hospital based upon an agency relationship unless the physician was an *actual* agent of the hospital. *Gilbert*, 156 Ill. 2d at 519.

*Gilbert* held that those decisions which refused to find a hospital liable on the basis of apparent agency "overlook[ed] two realities of modern hospital care." *Gilbert*, 156 Ill. 2d at 520. The first "reality" involves the "business of a modern hospital." *Gilbert*, 156 Ill. 2d at 520. The *Gilbert* court explained:

> " '[H]ospitals increasingly hold themselves out to the public in expensive advertising campaigns as offering and rendering quality health services. One need only

pick up a daily newspaper to see full and half page advertisements extolling the medical virtues of an individual hospital and the quality health care that the hospital is prepared to deliver in any number of medical areas. Modern hospitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are full-care modern health facilities. All of these expenditures have but one purpose: to persuade those in need of medical services to obtain those services at a specific hospital. In essence, hospitals have become big business, competing with each other for health care dollars.' " *Gilbert*, 156 Ill. 2d at 520, quoting *Kashishian v. Port*, 167 Wis. 2d 24, 38, 481 N.W.2d 277, 282 (1992).

The second "reality"of modern hospital care discussed by the *Gilbert* court involves the reasonable expectations of the public:

" 'Generally people who seek medical help through the emergency room facilities of modern-day hospitals are unaware of the status of the various professionals working there. Absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use while there, it is the reputation of the hospital itself upon which he would rely. Also, unless the patient is in some manner put on notice of the independent status of the professionals with whom he might be expected to come into contact, it would be natural for him to assume that these people are employees of the hospital.' " *Gilbert*, 156 Ill. 2d at 521, quoting *Arthur v. St. Peters Hospital*, 169 N.J. Super. 575, 583, 405 A.2d 443, 447 (1979).

Indeed, the *Gilbert* court observed, the appearance to a patient that a physician is an employee of the hospital " 'speak[s] much louder than the words of whatever private contractual arrangements the physicians and the hospital may have entered into, unbeknownst to the public, in an attempt to insulate the hospital from liability for the negligence, if any, of the physicians.' " *Gilbert*, 156 Ill. 2d at 521, quoting *Brown v.*

*Coastal Emergency Services, Inc.*, 181 Ga. App. 893, 898, 354 S.E.2d 632, 637 (1987), *aff'd*, 257 Ga. 507, 361 S.E.2d 164 (1987).

Based upon these realities of modern hospital care, the *Gilbert* court found that a serious question was raised regarding the liability of a hospital when a physician who is an independent contractor renders negligent health care: "Can a hospital always escape liability for the rendering of negligent health care because the person rendering the care was an independent contractor, regardless of how the hospital holds itself out to the public, regardless of how the treating physician held himself or herself out to the public with the knowledge of the hospital, and regardless of the perception created in the mind of the public?" *Gilbert*, 156 Ill. 2d at 522. The *Gilbert* court answered this query in the negative, holding that " 'a patient who is unaware that the person providing treatment is not the employee or agent of the hospital' " has the right to look to the hospital in seeking compensation for any negligence in providing care. *Gilbert*, 156 Ill. 2d at 522, quoting *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 207, 423 N.W.2d 848, 855 (1988).

In order to find a hospital vicariously liable for the negligence of independent-contractor physicians, the *Gilbert* court held that a plaintiff must plead and prove the doctrine of apparent agency, which provides that a principal will be bound not only by authority the principal actually gives to another, but also by the authority which the principal *appears* to give to another. *Gilbert*, 156 Ill. 2d at 523. This court explained:

> "Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. [Citations.] Where the principal creates the appearance of authority, the principal 'will not be heard to deny the agency to the prejudice of an innocent party, who has been led to rely upon the appearance of authority in the agent.' " *Gilbert*, 156 Ill.

2d at 523-24, quoting *Union Stock Yards & Transit Co. v. Malloy, Son & Zimmerman Co.*, 157 Ill. 554, 565, 41 N.E. 888, 891 (1895).

The *Gilbert* court noted that the apparent agency doctrine had "more commonly [been] applied in contract cases" and, in that context, a standard of detrimental reliance had been imposed: vicarious liability attached "where the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency." *Gilbert*, 156 Ill. 2d at 524.

Having recognized the apparent agency doctrine in other contexts, the *Gilbert* court held that the doctrine of apparent agency was also available in the unique context of a medical malpractice action. *Gilbert* established a specific framework for analyzing such claims. This court held in *Gilbert* that a hospital may be found vicariously liable under the doctrine of apparent agency for the negligent acts of a physician providing care at a hospital, "regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor." *Gilbert*, 156 Ill. 2d at 524. *Gilbert* then set forth the three elements a plaintiff must plead and prove to hold a hospital vicariously liable under the apparent agency doctrine:

> " 'For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show that: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Gilbert*, 156 Ill. 2d at 525, quoting *Pamperin*, 144 Wis. 2d at 207-08, 423 N.W.2d at 855-56.

With respect to the first element of an apparent agency claim against a hospital, *Gilbert* explained that in order to find "holding out" on the part of the hospital, it is not necessary that there be an express representation by the hospital that the

person alleged to be negligent is an employee. Rather, this element is satisfied if the hospital holds itself out as a provider of care without informing the patient that the care is provided by independent contractors. *Gilbert*, 156 Ill. 2d at 525.

With respect to the third element of an apparent agency claim against a hospital, *Gilbert* established that the element of a plaintiff's reliance is satisfied if the plaintiff relies upon the *hospital* to provide medical care, rather than upon a specific physician. *Gilbert*, 156 Ill. 2d at 525. *Gilbert* held that the "critical distinction" is whether the plaintiff sought care from the hospital itself or looked to the hospital merely as a place for his or her personal physician to provide medical care:

> " 'Except for one who seeks care from a specific physician, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself. An individual who seeks care from the hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care–from blood testing to radiological readings to the endless medical support services–will be provided by the hospital through its staff.' " *Gilbert*, 156 Ill. 2d at 525-26, quoting *Pamperin*, 144 Wis. 2d at 211-12, 423 N.W.2d at 857.

Applying these principles to the case before it, the *Gilbert* court held that the circuit court improperly granted summary judgment to the defendant hospital, as a genuine issue of material fact existed with respect to whether Dr. Frank was an apparent agent of the hospital. This court noted that, at the time decedent arrived at the emergency room, he asked for Dr. Stromberg, not Dr. Frank. Although both physicians practiced through KMA, Dr. Frank had never before met decedent; he merely happened to be covering the emergency room the day that decedent was brought there. We also noted that the hospital did not inform patients that the emergency room physicians were independent contractors, and that the hospital's treatment consent form, which was signed by decedent, stated that he would be treated by "physicians and employees of the hospital." *Gilbert*, 156 Ill. 2d at 526. This

court concluded that there was conflicting evidence as to both the hospital's "holding out" of emergency room care and decedent's justifiable reliance that the emergency room care was provided by the hospital rather than by Dr. Frank or KMA. At the very least, reasonable persons could draw different inferences from the facts of record. Accordingly, this court reversed the trial court's grant of summary judgment to the hospital and remanded the cause for further proceedings. *Gilbert*, 156 Ill. 2d at 526.

Three years after this court decided *Gilbert*, we revisited the concept of apparent agency–albeit in a different factual context–in *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208 (1996). In *O'Banner*, plaintiff brought an action to recover damages for personal injuries he allegedly sustained when he slipped and fell in the bathroom of a McDonald's restaurant. McDonald's filed a motion for summary judgment in the circuit court, contending that the restaurant in which plaintiff was injured was actually owned by one of its franchisees and that McDonald's neither owned, operated, maintained nor controlled the facility. The circuit court granted the summary judgment motion. A majority of the appellate court, however, reversed and remanded. This court reversed the appellate court and remanded the cause to the circuit court.

In *O'Banner*, this court noted that the circuit court entered summary judgment in favor of McDonald's on the basis that it was merely the franchisor of the restaurant and that, accordingly, it had no responsibility for the conditions that caused the accident. Plaintiff contended that McDonald's could be vicariously liable for the acts and omissions of the franchisee based on the doctrine of apparent agency. This court held that summary judgment on the apparent agency question was proper.

The *O'Banner* court noted that the apparent agency doctrine had long been recognized in this state and, at that time, had been recently discussed by this court in *Gilbert*. *O'Banner*, 173 Ill. 2d at 213. We explained in *O'Banner* that the doctrine of apparent agency is based upon principles of estoppel: "The idea is that if a principal creates the appearance that someone is his agent, he should not then be permitted to

deny the agency if an innocent third party reasonably relies on the apparent agency and is harmed as a result." *O'Banner*, 173 Ill. 2d at 213. The *O'Banner* court observed that, under the traditional formulation of the apparent agency doctrine, a showing of detrimental reliance on the part of the plaintiff was required: "a principle can be held vicariously liable in tort for injury caused by the negligent acts of his apparent agent if the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency." *O'Banner*, 173 Ill. 2d at 213.

Applying these principles of analysis to the case before it, the *O'Banner* court held that the plaintiff failed to present any evidence that the necessary element of reliance was present:

> "Even if one concedes that McDonald's advertising and other conduct could entice a person to enter a McDonald's restaurant in the belief it was dealing with an agent of the corporation itself, that is not sufficient. In order to recover on an apparent agency theory, O'Banner would have to show that he actually did rely on the apparent agency in going to the restaurant where he was allegedly injured." *O'Banner*, 173 Ill. 2d at 213.

This court noted that the pleadings and affidavit submitted by plaintiff stated only that he slipped and fell in the restroom of a McDonald's restaurant and there was "no indication as to why [plaintiff] went to the restaurant in the first place." *O'Banner*, 173 Ill. 2d at 214. Based upon the evidence presented by plaintiff, we concluded that "[t]he fact that this was a McDonald's may have been completely irrelevant to [plaintiff's] decision. For all we know, O'Banner went there simply because it provided the closest bathroom when he needed one or because some friend asked to meet him there." *O'Banner*, 173 Ill. 2d at 214. Accordingly, this court reversed the judgment of the appellate court and affirmed the circuit court's grant of summary judgment in favor of McDonald's.

In the instant appeal, Rush does not dispute the sufficiency of the evidence presented by plaintiff at trial with respect to the "holding out" element of plaintiff's apparent agency claim. Rush does assert, however, that pursuant to this court's decisions in *Gilbert* and *O'Banner*, plaintiff presented insufficient evidence

at trial to establish the reliance element of his apparent agency claim. Rush asserts that *O'Banner* and *Gilbert* require proof that representations made by Rush induced plaintiff to use the hospital for his surgery and that he believed that his attending anesthesiologist was an agent of the hospital. According to Rush, under this court's decisions in *Gilbert* and *O'Banner*, plaintiff at bar cannot recover because he failed to establish at trial that his injury would not have occurred but for his reliance on the services of Dr. El-Ganzouri as Rush's agent. Rush vigorously argues that this court's decision in *O'Banner* "tempered" our previous ruling in *Gilbert* and requires that a plaintiff seeking to hold a hospital vicariously liable for the malpractice of an independent contractor physician under the doctrine of apparent agency must establish detrimental reliance: the person asserting apparent agency must show that he or she relied on the "holding out" of the hospital or agent to his or her detriment in accepting treatment. Rush contends that the appellate court below erred when it held that in order to satisfy the reliance element of his apparent agency claim, plaintiff need not have shown that he would have refused treatment from Dr. El-Ganzouri had he known that the doctor was an independent contractor. Rush argues that a plaintiff who does not know the employment status of a physician, but who would have acted in exactly the same manner had he or she known of that status, should not be allowed to recover under the theory of apparent agency.

Rush underscores the split within our appellate court with respect to whether medical malpractice plaintiffs must establish a "but for" causal connection between the holding out by the hospital and the injury suffered by a plaintiff. According to Rush, *Butkiewicz v. Loyola University Medical Center*, 311 Ill. App. 3d 508 (2000), and *James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627 (1998), properly analyzed the element of reliance in an apparent agency claim arising in the context of a medical malpractice action. Rush observes that, in both *Butkiewicz* and *James*, the plaintiffs were unable to establish reliance upon representations of the defendant hospitals with respect to the *initial* decision to select the hospitals for providing treatment: in *Butkiewicz* the plaintiff's decedent was

referred to the hospital by his primary physician, and in *James* the plaintiff selected the hospital based upon her belief that her insurance carrier required her to go there. Rush emphasizes that these appellate court panels ruled that under such facts any subsequent reliance by the patients on the hospitals in choosing a particular physician was insufficient to establish vicarious liability against the hospitals under the doctrine of apparent agency when the doctor was negligent. Rush contends that, in the instant cause, the appellate court erred by rejecting the reasoning in *Butkiewicz* and *James* and holding that the reliance element is applied differently in medical malpractice actions than in other cases.

Rush asserts that this court's rulings in *Gilbert* and *O'Banner* establish that there is a but a single rule for proving the element of reliance in an apparent agency context, whether or not the case involves an action alleging medical malpractice. Rush contends that there is no rational reason for applying a different standard of reliance to apparent agency claims arising in a medical malpractice context.

In their briefs to this court, *amici* Illinois Hospital Association, Metropolitan Chicago Healthcare Council, and Advocate Health Care support the position taken by Rush. *Amici* argue that in order to satisfy the reliance element of an apparent agency claim against a hospital, a plaintiff must establish that a supposed agency relationship between the hospital and its doctors was determinative to the plaintiff's selection of the hospital. According to the *amici*, the appellate court decision below is in error because it holds that the element of reliance is satisfied as long as the plaintiff did not choose the negligent physician. Furthermore, the *amici* assert, the instant cause is clearly a matter wherein the apparent agency doctrine does not apply, as plaintiff looked to Rush merely as a place for his selected orthopedic surgeon, Dr. Rosenberg, to provide medical care.

In response, plaintiff counters that the appellate court correctly affirmed the jury verdict holding Rush vicariously liable for the negligent actions of Dr. El-Ganzouri under the doctrine of apparent agency. Plaintiff contends that sufficient evidence was presented at trial that he relied upon Rush,

rather than upon a specific physician, to provide anesthesiology care during his surgery. Plaintiff asserts that the appellate court correctly determined that this court's decision in *O'Banner* does not apply to medical malpractice cases and, therefore, does not alter the analysis of the apparent agency doctrine as set forth by this court in *Gilbert*. Plaintiff underscores that the *O'Banner* case, which deals with a slip-and-fall action at a restaurant, does not address the everyday realities of doctors who have hospital-based practices, who wear clothing displaying a hospital logo, who share administrative employees with a hospital, and who have their offices in the hospital.

Plaintiff contends that the element of reliance in an apparent agency action against a hospital involves unique circumstances that require unique rules. Therefore, plaintiff asserts, the appellate court below correctly chose to follow the rulings in *McCorry v. Evangelical Hospitals Corp.*, 331 Ill. App. 3d 668 (2002), and *Scardina v. Alexian Brothers Medical Center*, 308 Ill. App. 3d 359 (1999). Plaintiff underscores that both of these decisions follow *Gilbert*, rather than *O'Banner*, and hold that the relevant inquiry with respect to the reliance element is not whether the plaintiff reported to the hospital at the direction of another person but, rather, whether the plaintiff looked to the hospital to furnish all that is essential for treatment, including supporting medical personnel. Accordingly, plaintiff contends that the cases of *Butkiewicz* and *James* were wrongly decided.

In its *amicus* brief, the Illinois Trial Lawyers Association (ITLA) supports the position advocated by plaintiff. ITLA contends that, in the matter before us, the appellate court correctly applied the reliance requirement. In its argument, ITLA stresses that medical institutions such as Rush market themselves based upon the quality of their medical staffs. Therefore, ITLA asserts, such institutions cannot reasonably dispute that they hold themselves out as providers of care for the incidental–but nevertheless essential–physician services such as anesthesia, radiology and pathology. It follows then, according to ITLA, that even if the jury in the cause before us believed that plaintiff initially entered Rush only because his

chosen orthopedic surgeon practiced there, plaintiff could still establish that the other treating doctors, whose services were performed during the course of his stay, were apparent agents of Rush.

We agree with the arguments advanced by plaintiff and reject the position taken by Rush and its *amici*. In *Gilbert*, this court recognized that the relationship between a patient and health-care providers, both physicians and hospitals, presents a matrix of unique interactions that finds no ready parallel to other relationships. To underscore this point, we set forth in great detail what we termed the "realities of modern hospital care" and concluded that the fervent competition between hospitals to attract patients, combined with the reasonable expectations of the public that the care providers they encounter in a hospital are also hospital employees, raised serious public policy issues with respect to a hospital's liability for the negligent actions of an independent-contractor physician. It is against this specific factual backdrop that we extended the doctrine of apparent agency to instances wherein a plaintiff seeks to hold a hospital vicariously liable for the malpractice of an independent contractor physician.

Because of the unique context in which such actions are brought, *Gilbert* established an analytical framework tailored to this precise factual situation. We recognized that in the context of an apparent agency claim arising out of a medical malpractice action, the critical distinction is whether the patient relied upon the *hospital* for the provision of care or, rather, upon the services of a particular physician. *Gilbert*, 156 Ill. 2d at 525. We emphasize, however, that *Gilbert* did not hold that, regardless of the circumstances, the mere existence of a preexisting physician-patient relationship automatically precludes any claim by the patient of reliance upon the hospital for the support staff. Rather, *Gilbert* recognized that when a patient relies on a hospital for the provision of support services, even when a physician specifically selected for the performance of a procedure directs the patient to that particular hospital, there may be sufficient reliance under the theory of apparent agency for liability to attach to the hospital in the event one of the supporting physicians commits malpractice.

Accordingly, *Gilbert* held that a hospital may be found vicariously liable under the doctrine of apparent authority for the negligent acts of a physician providing care at a hospital, "regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor." *Gilbert*, 156 Ill. 2d at 524. *Gilbert* required that, in order to prevail on such a claim, a plaintiff must, *inter alia*, establish that he or she " 'acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' " *Gilbert*, 156 Ill. 2d at 525, quoting *Pamperin*, 144 Wis. 2d at 207-08, 423 N.W.2d at 855-56. *Gilbert* formulated this analytical framework for specific application to actions wherein a plaintiff seeks to hold a hospital vicariously liable for the malpractice of an independent contractor physician under the doctrine of apparent agency.

Accordingly, the appellate court below correctly determined that "those cases that have sought to incorporate the holding of *O'Banner* into the medical malpractice context have analyzed their cases with the wrong focus." 353 Ill. App. 3d at 29. Our decision in *O'Banner* is factually distinguishable from *Gilbert* and, therefore, inapposite to a resolution of the issues presented in this appeal. *O'Banner*'s discussion of the traditional detrimental reliance element of the apparent agency doctrine in the context of a slip-and-fall accident on commercial premises does not alter the analytical framework established in *Gilbert*, which has specific and limited application to the medical malpractice context.

As stated, *Gilbert* stands for the proposition that the reliance element of a plaintiff's apparent agency claim is satisfied if the plaintiff reasonably relies upon a hospital to provide medical care, rather than upon a specific physician. *Gilbert*, 156 Ill. 2d at 525. Upon admission to a hospital, a patient seeks care from the hospital itself, except for that portion of medical treatment provided by physicians specifically selected by the patient. If a patient has not selected a specific physician to provide certain treatment, it follows that the patient relies upon the hospital to provide complete care–including support services such as radiology, pathology, and

anesthesiology–through the hospital's staff. If, however, a patient does select a particular physician to perform certain procedures within the hospital setting, this does not alter the fact that a patient may nevertheless still reasonably rely upon the hospital to provide the remainder of the support services necessary to complete the patient's treatment. Generally, it is the hospital, and not the patient, which exercises control not only over the provision of necessary support services, but also over the personnel assigned to provide those services to the patient during the patient's hospital stay. To the extent the patient reasonably relies upon the hospital to provide such services, a patient may seek to hold the hospital vicariously liable under the apparent agency doctrine for the negligence of personnel performing such services even if they are not employed by the hospital.

It is this reasoning that animated our decision in *Gilbert.* In *Gilbert*, we held that the plaintiff had presented sufficient evidence with respect to the decedent's reliance on the hospital to withstand the hospital's summary judgment motion. We observed that even though decedent had specifically requested that Dr. Stromberg attend to him upon his admission to the emergency room, he was instead treated by Dr. Frank, who had never before met decedent. In addition, we noted that the hospital did not inform patients that the emergency room physicians were independent contractors. Finally, we observed that the language employed in the hospital's treatment consent form could have led plaintiff to reasonably believe that he would be treated by physicians and employees of the hospital. We concluded that, upon the record before us, the plaintiff adduced sufficient evidence to create a genuine issue of material fact with respect to the reliance element of the plaintiff's apparent agency claim against the hospital.

Similarly, we hold that, in the instant cause, plaintiff presented sufficient evidence at trial to support the jury's verdict finding Rush vicariously liable under the doctrine of apparent agency for the malpractice of Dr. El-Ganzouri. Reviewing the jury's verdict in the light most favorable to plaintiff, as we must, we determine that under the legal framework set forth in *Gilbert*, the appellate court properly

affirmed the circuit court's denial of Rush's posttrial motion for judgment *n.o.v.* In addition, we hold that the circuit court did not abuse its discretion in denying Rush's posttrial motion for a new trial.

Plaintiff testified at trial that, prior to his coming to Rush, he had personally selected each and every orthopedic surgeon who had treated his knees. However, in 1994, plaintiff's son Jeff was an anesthesiology resident at Rush, and plaintiff asked Jeff to "look into Rush" as an option for his knee replacement surgery. Plaintiff stated that he recognized that successful knee replacement surgery requires the services of numerous medical and nursing professionals, in addition to the skills of a trained orthopedic surgeon, and that he had previously heard of Rush through his colleagues and by virtue of the fact that his son was a resident there. Plaintiff testified that he knew there were "good docs at Rush," and he eventually selected Dr. Rosenberg to perform the surgery. Plaintiff's testimony was supported by that of his son Jeff, who testified that he recommended Rush to his father because he thought highly of Rush and was enthusiastic about its health-care services. According to Jeff, he knew that his father could get good surgical care at Rush, and he encouraged plaintiff to select Rush for his knee replacement operation. This uncontroverted evidence revealed that it was only after plaintiff developed an interest in Rush, based upon his knowledge of the hospital and its staff, that he sought out a particular orthopedic surgeon at that institution.

The evidence presented at trial further revealed that Rush failed to place plaintiff on notice that Dr. El-Ganzouri was an independent contractor, and not an employee, of Rush. Plaintiff testified that during his interactions with Dr. El-Ganzouri, Dr. El-Ganzouri wore either scrubs covered with the Rush logo or a lab coat that displayed the Rush emblem. Plaintiff's testimony on this point was echoed by plaintiff's son Jeff and Dr. El-Ganzouri during their own testimony. As such, this evidence stood uncontroverted.

Furthermore, the evidence adduced at trial showed that nothing in the treatment consent form drafted by Rush and signed by plaintiff alerted plaintiff that Dr. El-Ganzouri was an

independent contractor. The treatment consent form nowhere stated that plaintiff would be treated by independent-contractor physicians; rather, the form stated that plaintiff authorized: "Dr. Rosenberg and such assistants and associates as may be selected by him *** and the Rush-Presbyterian-St. Luke's Medical Center to perform the following procedures ***." We agree with the appellate court below that "the language of the consent providing that Rush could select physicians to assist in the knee surgery could reasonably be interpreted as allowing Rush to select anesthesiologists." 353 Ill. App. 3d at 30-31.

In addition to the fact that Dr. El-Ganzouri wore scrubs and a lab coat with Rush insignia, as well as the lack of notice of Dr. El-Ganzouri's independent-contractor status in the treatment consent form signed by plaintiff, further evidence was presented at trial to support the conclusion that plaintiff did not know, and had no reason to know, the true employment status of Dr. El-Ganzouri. Plaintiff's son, Dr. Jeff York, stated that it was not the policy of the anesthesiologists who practiced at Rush to discuss their employment relationships with their patients. Dr. El-Ganzouri confirmed Jeff's statement by his own testimony that he would not tell a patient about his employment status as an independent contractor. Jeff further testified that he never spoke with his father about University Anesthesiologists and the employment status of its physicians prior to plaintiff's surgery.

Rush attempted to counter this evidence by emphasizing that because plaintiff was himself self-employed as an independent contractor when he practiced as an orthopedic surgeon at Somerset Hospital, plaintiff had to have been aware that anesthesiologists also work as independent contractors. Plaintiff, however, testified at trial that he was unaware of the employment status of the anesthesiologists he had worked with in the past because he was very focused upon his own medical practice. In an attempt to question plaintiff's testimony on this point, Rush called Dr. Glesmann, an anesthesiologist who worked with plaintiff at Somerset Hospital. Although Dr. Glesmann testified that he had been an independent contractor at Somerset, no evidence was presented that he explicitly informed plaintiff of this fact. In addition, Dr. Glesmann

acknowledged that sometimes larger teaching hospitals directly employ their anesthesiologists. Based upon all of the above evidence, we conclude that a jury could infer that plaintiff reasonably believed that Dr. El-Ganzouri was an employee of Rush, rather than an independent contractor.

We also hold that, based upon the evidence presented at trial, there were sufficient grounds for the jury to find that plaintiff did not know who would serve as his attending anesthesiologist and that plaintiff relied upon Rush to provide that individual. With respect to the February 9, 1998, surgery at issue in this appeal, plaintiff testified that he had originally asked his son Jeff to see if plaintiff could have the same anesthesia team for that surgery as he had for one of his prior knee surgeries at Rush. According to plaintiff, he was unaware as to how this team was first assigned to his case, but he very much liked Dr. Krolick and Dr. Miller and had hoped that they could again be assigned to the February surgery. Plaintiff stated that prior to the surgery he discovered that Dr. Miller would be the resident anesthesiologist, but that Dr. Krolick was unavailable to serve as the attending anesthesiologist. Plaintiff testified that prior to his February surgery, he was unaware whom the attending anesthesiologist would be. Plaintiff stated that he assumed Rush would select the attending anesthesiologist and that he knew that Rush had good doctors based upon the results of his prior two surgeries. With respect to his prior surgeries, plaintiff testified that he relied upon the surgeon and/or the hospital to select the attending anesthesiologist because he had "faith in the institutions."

Plaintiff's son Jeff testified that he had requested Dr. Krolick to serve as his father's attending anesthesiologist for the February 1998 surgery because his father had been comfortable with him during his prior knee operation. Prior to plaintiff's February 1998 surgery, Jeff stated, he knew that Dr. Miller would be the resident anesthesiologist, but he did not know who the attending anesthesiologist would be, as Dr. Krolick was not available. According to Jeff, Ray Narbone, an employee of Rush, handled the scheduling and assignment of anesthesiologists to surgical cases. Jeff testified that he was

unaware that Dr. El-Ganzouri had been assigned by Narbone as the attending anesthesiologist for his father's case.

This evidence was supported by the testimony of Dr. Miller, who served as the resident anesthesiologist during plaintiff's February 1998 surgery. Dr. Miller testified that he was requested to participate in plaintiff's surgery, along with Dr. Krolick. However, because Dr. Krolick was unavailable to serve as the attending anesthesiologist, Dr. Miller stated, Dr. El-Ganzouri was substituted on the basis that he was the next available attending anesthesiologist. According to Dr. Miller, plaintiff did not select Dr. El-Ganzouri to serve as his attending anesthesiologist, and he believed plaintiff first met Dr. El-Ganzouri on the morning of his surgery. This belief was confirmed by Dr. El-Ganzouri's own testimony, wherein he stated that his first contact with plaintiff was immediately prior to the commencement of plaintiff's operation.

Conflicting evidence with respect to the scheduling of Dr. El-Ganzouri as plaintiff's attending anesthesiologist was offered through the testimony of Dr. Catherine Wilson–plaintiff's treating psychologist at the Rehabilitation Institute of Chicago–and Ray Narbone. Dr. Wilson stated that upon plaintiff's arrival at the Rehabilitation Institute, she recorded in her progress notes that he was very angry at the medical profession in general and with his son Jeff in particular. Dr. Wilson testified that plaintiff was upset with Jeff because he felt that his son let him down with respect to the selection of his attending anesthesiologist. However, Dr. Wilson explained in further testimony that her note demonstrated something other than plaintiff's knowledge that Jeff chose Dr. El-Ganzouri as his attending anesthesiologist.

Narbone's testimony confirmed that he was a Rush employee and that he scheduled Dr. El-Ganzouri as plaintiff's attending anesthesiologist. However, Narbone testified that, as a general matter, he would often consider "special requests" from hospital personnel to schedule particular anesthesiologists for specific cases. Narbone stated that it was his belief that plaintiff's son Jeff requested that Dr. Miller and Dr. El-Ganzouri be assigned as the anesthesiologists for plaintiff's February 1998 surgery. Narbone, however, stated

that he could not recall any details about Jeff's alleged request for Dr. El-Ganzouri, and that there were no notations on the scheduling charts to support his recollection. Narbone testified that he believed that Jeff made the request for Dr. El-Ganzouri because "that is what always happens." Narbone did state, however, that plaintiff himself did not make any request for the assignment of physicians.

We conclude that the contradictory evidence presented through the testimony of Dr. Wilson and Ray Narbone, when viewed in the light most favorable to plaintiff, does not so overwhelmingly favor Rush that no contrary verdict based on the evidence adduced at trial could ever stand. See *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We hold that, based upon the entirety of the evidence presented at trial, the jury had a sufficient basis upon which to find that plaintiff was justified in believing that Dr. El-Ganzouri was employed by Rush and that plaintiff relied upon Rush to make the assignment of Dr. El-Ganzouri as the attending anesthesiologist.

We agree with the appellate court below that there is sufficient evidence to support the conclusion that plaintiff came into contact with the injury-causing instrumentality–a negligent doctor–because he relied upon Rush to provide his attending anesthesiologist. Rush emphasizes the fact that plaintiff always selected his orthopedic surgeon, which, in Rush's view, leads to the inescapable conclusion that plaintiff must also have selected his anesthesiologist and, therefore did not rely on Rush. We disagree with Rush that such a conclusion is inescapable based upon the evidence presented at trial. Similarly, Rush argues that Dr. Jeff York's original request for Dr. Krolick to serve as his father's attending anesthesiologist for the February 1998 surgery also leads to the conclusion that Dr. El-Ganzouri was subsequently similarly selected to be the attending anesthesiologist. Again, we disagree with Rush. These are questions of fact to be determined by the jury (*Gilbert*, 156 Ill. 2d at 524), and, we believe, the jury had sufficient evidence to resolve these questions in favor of plaintiff.

Accordingly, we hold that the circuit court did not err in denying Rush's posttrial motion for judgment *n.o.v.* Similarly, based upon the evidence adduced at trial, we cannot say that the jury's verdict in favor of plaintiff and against Rush was contrary to the manifest weight of the evidence: the opposite conclusion was not clearly evident, the jury's findings were neither unreasonable nor arbitrary, and the findings of the jury were based upon the evidence. See *McClure*, 188 Ill. 2d at 132. Accordingly, the circuit court did not abuse its discretion in denying Rush's motion for a new trial.

We agree with the appellate court below that "there is no injustice in this imposition of vicarious liability." 353 Ill. App. 3d at 30. As we extensively discussed in *Gilbert*, hospitals today actively promote themselves as centers for complete medical care and reap profits when competent service is provided by the independent doctors in their facilities. As the appellate court below noted, the imposition of vicariously liability in the matter at bar may "encourage hospitals to provide better supervision and quality control over the independent physicians working in their facilities." 353 Ill. App. 3d at 30.

Our decision today, however, does not alter our pronouncement in *Gilbert* that if a patient knows, or should have known, that the allegedly negligent physician is an independent contractor, that patient may not seek to hold the hospital vicariously liable under the apparent agency doctrine for any malpractice on the part of that physician. In other words, if a patient is placed on notice of the independent status of the medical professionals with whom he or she might be expected to come into contact, it would be unreasonable for a patient to assume that these individuals are employed by the hospital. It follows, then, that under such circumstances a patient would generally be foreclosed from arguing that there was an appearance of agency between the independent contractor and the hospital.

We next briefly address the additional argument raised by Rush that a new trial is required because the circuit court refused to tender to the jury an instruction encompassing Rush's defense to apparent agency liability. As stated earlier in this opinion, the circuit court admonished the jury using IPI Civil

(Supp. 2003) No. 105.10. According to Rush, the circuit court violated the rule that " '[a] litigant has the right to have the jury clearly and fairly instructed upon each theory which [is] supported by the evidence' " (*LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 406 (1998), quoting *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100 (1995)), because the court refused to provide the jury with Rush's proffered instruction, which added the following italicized phrase to the relevant portion of the pattern instruction: "Second, that [plaintiff] *or others* did not choose Abdul Raoul El-Ganzouri, M.D. but relied upon Rush Presbyterian St.Lukes Medical Center to provide anesthesia services." (Emphasis added.) Rush observes that the notes to IPI No. 105.10 suggest that the phrase "or others" should be used "where there is evidence that a person or persons other than the plaintiff or the decedent relied upon the principal to provide the medical care under consideration." IPI Civil (Supp. 2003) No. 105.10, Notes on Use, at 27.

Rush asserts that without the "or others" language, the instruction implied that so long as plaintiff did not select Dr. El-Ganzouri–and even if his son Jeff did–the jury could still find that plaintiff relied upon Rush. According to Rush, the omission of the phrase "or others" practically compelled the jury to find that if plaintiff did not select Dr. El-Ganzouri, then Rush would be liable under an apparent agency theory. Rush concludes that the tendering of this instruction crippled its primary defense–that Jeff selected Dr. El-Ganzouri for the surgery–and, therefore, its right to a fair trial was seriously prejudiced.

We disagree. Whether to provide a particular jury instruction is within the sound discretion of the trial court, and the court's decision will be reversed only where the trial court abused its discretion. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). A trial court does not abuse its discretion so long as, "taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz*, 201 Ill. 2d at 273-74. A trial court is required to use an Illinois pattern jury instruction when it is applicable in a civil case after giving due consideration to the facts and prevailing law, unless the court determines that the instruction does not accurately state the

law. 177 Ill. 2d R. 239(a); *Hobart v. Shin*, 185 Ill. 2d 283, 294 (1998). We hold that the trial court did not abuse its discretion in tendering to the jury the challenged instruction absent the "or others" language advocated by Rush. Under the given instruction, the jury's consideration of Jeff's potential involvement in the selection of his father's attending anesthesiologist was not foreclosed. We agree with the appellate court below:

> "Under [the given instruction] [plaintiff] had to prove not only that he did not choose Dr. El-Ganzouri to be his anesthesiologist, but also that he, instead, relied on Rush. Under the given instruction, had the jury believed that [plaintiff] relied on Dr. Jeff York, and not Rush, it still could have returned a finding of no liability. Thus, we find the jury to still have been fairly apprised of the law under the instruction it received." 353 Ill. App. 3d at 34.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Affirmed.*

JUSTICE GARMAN, dissenting:

The majority interprets this court's decision in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993), far too broadly and, in doing so, dilutes the "reliance" element of apparent authority claims against hospitals. Under the position adopted by the majority, the fact a plaintiff sought care from a specific physician is now virtually inconsequential in determining whether a hospital is vicariously liable for the negligence of an independent contractor physician. In effect, as long as the plaintiff can satisfy the "holding out" element of his apparent authority claim, he may recover from the hospital. This approach conflicts with the rationale this court originally set forth for allowing apparent authority claims against hospitals in *Gilbert* and promises to significantly expand the scope of apparent authority liability.

˘49˘

As a preliminary matter, I would clarify that while this case requires us to review the sufficiency of the evidence supporting the jury's verdict against Rush-Presbyterian-St. Luke's Medical Center (Rush), deciding whether the evidence is sufficient is not simply a matter of evaluating it in light of clearly established law. On the contrary, this case calls on us to examine the requirements of the apparent authority theory of liability itself, which this court recognized in *Gilbert* as a basis for holding hospitals vicariously liable for the negligence of independent-contractor physicians. *Gilbert*, 156 Ill. 2d at 524-25. Thus, although we are reviewing a jury verdict, the deference we must accord to that verdict extends only to factual inferences or conclusions drawn from the evidence presented to the jury and should have no bearing on our purely legal determination regarding the principles under which that evidence must be evaluated. See *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53 (1992) (noting "it is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide what weight should be given to the witnesses' testimony," and a court of review "should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way").

*Gilbert* is the correct point of departure for analyzing this case, but it does not, as the majority suggests, resolve all of the issues presented here. *Gilbert* established that a hospital may be vicariously liable for the negligent acts of a physician who is an independent contractor. *Gilbert*, 156 Ill. 2d at 518-23. It also set forth the means by which a plaintiff may prove a hospital's vicarious liability. *Gilbert*, 156 Ill. 2d at 523-26. The rationale expressed in *Gilbert* for allowing hospitals to be held vicariously liable for the acts of independent contractors has to do with what *Gilbert* termed the "realities of modern hospital care," particularly the "business of a modern hospital" and "the reasonable expectations of the public." *Gilbert*, 156 Ill. 2d at 520-21. According to *Gilbert*, the business of modern hospitals is characterized by advertising campaigns intended to promote hospitals' good reputations by holding hospitals out to the public as providers of quality health care. See *Gilbert*, 156 Ill.

2d at 520, quoting *Kashishian v. Port*, 167 Wis. 2d 24, 38, 481 N.W.2d 277, 282 (1992). Further, it is typically reasonable for members of the public who seek health care from hospitals to assume that the physicians who care for them are hospital employees, since patients are generally unaware of the nature of the employment relationships between hospitals and the physicians who work there. See *Gilbert*, 156 Ill. 2d at 521, quoting *Arthur v. St. Peters Hospital*, 169 N.J. Super. 575, 583, 405 A.2d 443, 447 (1979). Given these justifications for holding hospitals vicariously liable, *Gilbert* concluded that a plaintiff may prove a hospital's vicarious liability through a claim based on the doctrine of apparent authority. *Gilbert*, 156 Ill. 2d at 523-24. The elements of an apparent authority claim include a "holding out" by the hospital that the individual alleged to be negligent is a hospital employee and "justifiable reliance" by the plaintiff on that "holding out." See *Gilbert*, 156 Ill. 2d at 525.

As *Gilbert* acknowledged, the doctrine of apparent authority is normally applied in contract cases. *Gilbert*, 156 Ill. 2d at 524. In that context, the doctrine binds a principal to a contract that an apparent agent makes while acting within the scope of the apparent authority with which the principal has clothed him. *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 439 (Ryan, J., dissenting, joined by Underwood and Ward, JJ.); see also *Gilbert*, 156 Ill. 2d at 524, citing *Lynch*, 82 Ill. 2d at 439 (Ryan, J., dissenting, joined by Underwood and Ward, JJ.). The doctrine functions like estoppel: where a principal creates the appearance of authority, a court will not hear the principal's denial of agency to the prejudice of an innocent third party who has been led to reasonably rely upon the agency and is harmed as a result. *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999). *Gilbert* recognized that the doctrine of apparent authority can also serve as a basis for imposing tort liability (*Gilbert*, 156 Ill. 2d at 524) and set forth some specific guidelines as to how a claim based on the doctrine plays out in the context of emergency room medical malpractice (*Gilbert*, 156 Ill. 2d at 524-26). *Gilbert* established that a hospital cannot be held liable under the doctrine of apparent authority if a plaintiff knew, or should have known, that the physician who

committed malpractice was an independent contractor. *Gilbert*, 156 Ill. 2d at 524. It further explained that the "holding out" element of an apparent authority claim "is satisfied if the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by independent contractors." *Gilbert*, 156 Ill. 2d at 525. In addition, *Gilbert* stated that the "reliance" element of an apparent authority claim "is satisfied if the plaintiff relies upon the hospital to provide complete emergency room care, rather than upon a specific physician." *Gilbert*, 156 Ill. 2d at 525. The " 'critical distinction' " is whether the plaintiff seeks care from the hospital itself or merely looks to the hospital as a place for a personal physician to provide care. *Gilbert*, 156 Ill. 2d at 525, quoting *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 211-12, 423 N.W.2d 848, 857 (1988).

*Gilbert* represents a divergence from the general rule that no vicarious liability exists for the actions of independent contractors. *Petrovich*, 188 Ill. 2d at 31. This divergence is justified in the medical malpractice context by the policy rationale set forth in *Gilbert*. See *Gilbert*, 156 Ill. 2d at 520-22. *Gilbert* also represents an attempt to explain the conditions under which vicarious liability will attach to a hospital in a given case. See *Gilbert*, 156 Ill. 2d at 523-26. The elements of an apparent authority claim that *Gilbert* recognizes broadly reflect these conditions, and *Gilbert* takes the additional step of expressing them in more specific terms by explaining what a plaintiff must prove to satisfy the "holding out" and "reliance" elements in the context of emergency care malpractice. Here, we are faced with a situation where we must further clarify how an apparent authority claim against a hospital should proceed. As I shall explain, unlike in *Gilbert*, the record in this case clearly demonstrates that plaintiff sought care from a particular physician, rather than from the hospital itself, when he made his initial decision to undergo knee surgery at Rush. Contrary to what the majority's analysis suggests, this fact should have significant bearing on determining whether plaintiff satisfied the "reliance" element of his apparent authority claim.

The majority characterizes *Gilbert* as recognizing that "when a patient relies on a hospital for the provision of support

services, *even when a physician specifically selected for the performance of a procedure directs the patient to that particular hospital*, there may be sufficient reliance under the theory of apparent agency for liability to attach to the hospital in the event one of the supporting physicians commits malpractice." (Emphasis added.) Slip op. at 37. I find no support in *Gilbert* for this proposition. In fact, *Gilbert* contains language to the contrary. For instance, quoting *Arthur v. St. Peters Hospital*, *Gilbert* states, " '*Absent a situation where the patient is directed by his own physician or where the patient makes an independent selection as to which physicians he will use while [at the hospital]*, it is the reputation of the hospital itself upon which [the patient] would rely.' " (Emphasis added.) *Gilbert*, 156 Ill. 2d at 521, quoting *Arthur*, 169 N.J. Super. at 583, 405 A.2d at 447. Likewise, quoting *Pamperin v. Trinity Memorial Hospital*, *Gilbert* states, " '*Except for one who seeks care from a specific physician*, if a person voluntarily enters a hospital without objecting to his or her admission to the hospital, then that person is seeking care from the hospital itself.' " (Emphasis added.) *Gilbert*, 156 Ill. 2d at 525-26, quoting *Pamperin*, 144 Wis. 2d at 211-12, 423 N.W.2d at 857. This language does not suggest that *Gilbert* recognized the possibility of allowing recovery under the doctrine of apparent authority "when a patient relies on a hospital for the provision of support services, even when a physician specifically selected for the performance of a procedure directs the patient to that particular hospital." Slip op. at 37. If anything, it suggests reservation over holding a hospital vicariously liable where a patient seeks care from a particular physician. Yet, the majority makes no effort to explain this language. Instead, the majority simply uses its initial misreading of *Gilbert* as a basis for further misattributions, concluding that the "reasoning which animated our decision in *Gilbert*" was that:

> "[T]he reliance element of a plaintiff's apparent agency claim is satisfied if the plaintiff reasonably relies upon a hospital to provide medical care, rather than upon a specific physician. [Citation.] Upon admission to a hospital, a patient seeks care from the hospital itself, except for that portion of medical treatment provided by

physicians specifically selected by the patient. If a patient has not selected a specific physician to provide certain treatment, it follows that the patient relies upon the hospital to provide complete care–including support services such as radiology, pathology, and anesthesiology–through the hospital's staff. If, however, a patient does select a particular physician to perform certain procedures within the hospital setting, this does not alter the fact that a patient may nevertheless still reasonably rely upon the hospital to provide the remainder of the support services necessary to complete the patient's treatment. Generally, it is the hospital, and not the patient, which exercises control not only over the provision of necessary support services, but also over the personnel assigned to provide those services to the patient during the patient's hospital stay. To the extent the patient reasonably relies upon the hospital to provide such services, a patient may seek to hold the hospital vicariously liable under the apparent agency doctrine for the negligence of personnel performing such services even if they are not employed by the hospital." Slip op. at 38.

*Gilbert* does acknowledge that the "reliance" element of a plaintiff's apparent authority claim hinges on whether the plaintiff sought care from the hospital itself or from a particular physician. See *Gilbert*, 156 Ill. 2d at 525-26, quoting *Pamperin*, 144 Wis. 2d at 211-12, 423 N.W.2d at 857. It is inaccurate, however, for the majority to assert that the other propositions quoted above "animated our decision in *Gilbert*." Slip op. at 38.

The fact of the matter is that only a small portion of the discussion in *Gilbert* was devoted to the "reliance" element of an apparent authority claim. See *Gilbert*, 156 Ill. 2d at 525-26. More importantly, to the extent *Gilbert* did address reliance, it did so in relation to a different factual scenario from the one at issue here. As mentioned, *Gilbert* dealt with medical malpractice committed in the course of emergency care. *Gilbert*, 156 Ill. 2d at 516. This case involves malpractice committed during a scheduled surgical procedure at Rush. Furthermore, the doctor who committed malpractice in *Gilbert*,

a general practitioner on call in the emergency room, was primarily responsible for treating the plaintiff upon the plaintiff's admission to the defendant hospital. *Gilbert*, 156 Ill. 2d at 515-17. Here, an anesthesiologist providing a service ancillary to plaintiff's knee surgery caused plaintiff's injuries. Finally, in *Gilbert*, it was unclear whether the plaintiff chose to use the defendant hospital for the sole purpose of seeing a particular physician. The evidence disclosed only that the plaintiff asked for a particular physician after he arrived at the hospital, and the physician was not on call. *Gilbert*, 156 Ill. 2d at 516, 526. As a result, *Gilbert* did not directly address the consequences of a patient's decision to use a hospital as a means of obtaining care from a particular physician. In this case, plaintiff testified at trial that he would have gone to the surgeon who performed his knee surgery even if the surgeon had moved his practice to a hospital other than Rush.

In short, this case presents a situation where a patient arranged a procedure in advance with a particular physician and was injured by the malpractice of another physician providing a support service related to the scheduled procedure. *Gilbert* did not involve these circumstances. In addition, *Gilbert* was not primarily concerned with establishing standards to govern the application of the "reliance" element of the apparent authority claim. The majority's reading of *Gilbert* erroneously suggests that *Gilbert* resolved the reliance issues before us in this case.

As mentioned, *Gilbert* recognized, as a general matter, that the "reliance" element of a plaintiff's apparent authority claim hinges on whether the plaintiff sought care from the hospital itself or from a particular physician. *Gilbert*, 156 Ill. 2d at 525-26. To summarily conclude, as the majority does, that "[i]f *** a patient does select a particular physician to perform certain procedures," the patient "may nevertheless still reasonably rely upon the hospital to provide the remainder of the support services necessary to complete the patient's treatment" (slip op. at 38) ignores two of the main questions posed by Rush. First, may a patient recover based on the doctrine of apparent authority *at all* where he chooses a hospital for his treatment because he handpicked a particular physician to perform the

treatment, and the physician practices only at that hospital? Second, to satisfy the "reliance" element of an apparent authority claim, should a patient who schedules a procedure with a particular physician, and who is injured by another physician providing a support service, have to prove that his belief regarding the employment status of the physician who committed malpractice actually mattered in his decision to proceed with treatment?

While the majority does not squarely address either of these questions, its analysis implicitly answers "yes" to the first and "no" to the second. The majority provides no reasoned justification for this approach. Instead, it makes vague references to the uniqueness of situations involving medical malpractice by independent contractors, and to the specificity of the apparent authority theory of liability outlined in *Gilbert*. Initially, the majority states that "the relationship between a patient and health-care providers, both physicians and hospitals, presents a matrix of unique interactions that finds no ready parallel to other relationships." Slip op. at 36. This strikes me as an overstatement, but to the extent the relationship between patients and health-care providers does have unique characteristics, those characteristics, broadly described in *Gilbert* as the "realities of modern hospital care" (*Gilbert*, 156 Ill. 2d at 520), merely justify recognizing an exception to the general rule that no vicarious liability exists for the actions of independent contractors. They do not justify allowing a patient to proceed with an apparent authority claim under any and all circumstances involving the medical malpractice of an independent contractor working in a hospital. The majority further states that because of the "unique context" in which actions seeking to hold a hospital vicariously liable for the malpractice of an independent contractor physician are brought, "*Gilbert* established an analytical framework tailored to this precise factual situation." Slip op. at 37. Reiterating this point, the majority notes, "*Gilbert* formulated [its] analytical framework for specific application to actions wherein a plaintiff seeks to hold a hospital vicariously liable for the malpractice of an independent contractor physician under the doctrine of apparent agency." Slip op. at 37. I agree that *Gilbert*

established a framework to address the situation in which an independent contractor commits medical malpractice while working in a hospital. The fact *Gilbert* established a framework, however, does not mean it is not subject to further refinement. There are multiple scenarios in which an independent contractor can commit medical malpractice in a hospital setting, and *Gilbert* dealt only with malpractice committed during the course of emergency care by a general practitioner who was primarily responsible for treating the plaintiff (*Gilbert*, 156 Ill. 2d at 515-16).

Turning to the questions posed by Rush, I would note that where, as here, a patient chooses to undergo a procedure at a given hospital for the sole purpose of receiving treatment from a particular physician, and the patient is injured by the malpractice of another physician providing a support service, allowing the patient to proceed with an apparent authority claim against the hospital creates tension with the underlying rationale expressed in *Gilbert* for allowing hospitals to be held vicariously liable for the malpractice of independent-contractor physicians. Part of that rationale is that hospitals hold themselves out to the public through marketing campaigns as providers of quality health care in hopes of persuading the public to utilize their services. See *Gilbert*, 156 Ill. 2d at 520. If a hospital that has been sued comes forward with proof that the plaintiff patient sought care from a particular physician, and would have obtained treatment from that physician regardless of where the physician was practicing, the assumption is no longer valid that the patient relied on the reputation the hospital held out to the public in deciding to undergo treatment there. I do not believe that, under these circumstances, a patient should be altogether precluded from recovering pursuant to the doctrine of apparent authority. After all, it is true that a patient who schedules a procedure with a particular physician may still look to the hospital where the procedure will be performed to provide support services necessary to complete the procedure. Yet, "relying," in the general sense of the term, on the hospital to provide support services is not the same as "reliance," in the context of an apparent authority claim, on the hospital's act of "holding out" a support service physician as an employee.

Moreover, where allowing recovery against a hospital on the basis of an apparent authority claim is somewhat at odds with the underlying rationale for subjecting hospitals to vicarious liability in the first place, it seems appropriate to require more rigorous proof of "reliance." Accordingly, in cases where a patient chooses to undergo a procedure at a given hospital for the sole purpose of receiving treatment from a particular physician, and the patient is injured by the malpractice of another physician providing a support service, I find it reasonable to require the patient to prove that his belief regarding the employment status of the physician who committed malpractice actually mattered in his decision to proceed with his treatment. As Rush suggests, to prove reliance, the patient should have to demonstrate he accepted treatment from the physician whose conduct is at issue because he assumed the physician was not an independent contractor. A patient who would have acted in exactly the same manner if he had known the employment status of the physician should not be allowed to recover from the hospital.

Applying these principles to the case at bar, I would hold that plaintiff failed to produce sufficient evidence to establish the "reliance" element of his apparent authority claim against Rush.

Briefly, Rush does not dispute the sufficiency of the evidence presented at trial with respect to the "holding out" element of plaintiff's apparent authority claim. Indeed, the evidence revealed that plaintiff's anesthesiologist, Dr. Abdel Raouf El-Ganzouri, wore either scrubs or a lab coat displaying the Rush logo during his interactions with plaintiff, and that nothing in the treatment consent form signed by plaintiff indicated Dr. El-Ganzouri was an independent contractor.

With respect to the "reliance" element of plaintiff's apparent authority claim, the majority interprets the testimony presented at trial as providing a sufficient basis for the jury to reasonably conclude that plaintiff did not know, and had no reason to know, that Dr. El-Ganzouri was an independent contractor, not an employee of Rush. Slip op. at 39-41. In addition, the majority interprets the testimony presented at trial as providing a sufficient basis for the jury to reasonably conclude that

plaintiff did not know who would serve as his attending anesthesiologist, and that he depended on Rush, not his son, to select that individual. Slip op. at 41-43. I cannot help but view with some suspicion the conclusion that plaintiff, who was himself an independent contractor physician for many years, and whose son was an anesthesiology resident at Rush at the time of plaintiff's surgery, did not know that Dr. El-Ganzouri was an independent contractor. I also cannot accept without some hesitation the conclusions that plaintiff did not know Dr. El-Ganzouri would be his attending anesthesiologist and that plaintiff did not depend on his son to select Dr. El-Ganzouri, given the conflicting evidence on these points. See slip op. at 42-43. Nevertheless, whether plaintiff knew or should have known that Dr. El-Ganzouri was an independent contractor is a factual question, and concluding on review that plaintiff knew or should have known that Dr. El-Ganzouri was an independent contractor would require ignoring the jury's credibility determinations. Likewise, whether plaintiff knew Dr. El-Ganzouri would be his attending anesthesiologist and whether plaintiff depended on his son to select Dr. El-Ganzouri are also factual questions. To conclude on review that plaintiff knew Dr. El-Ganzouri was going to be his attending anesthesiologist and that plaintiff depended on his son's selection of Dr. El-Ganzouri would require impermissibly second-guessing the jury's resolution of conflicting testimony.

Yet, even conceding that the jury could reasonably have concluded that plaintiff neither knew nor should have known that Dr. El-Ganzouri was an independent contractor, that plaintiff did not know Dr. El-Ganzouri would be his attending anesthesiologist, and relatedly, that plaintiff depended on Rush, rather than on his son, to select an attending anesthesiologist, the evidence presented at trial was not sufficient to satisfy the "reliance" element of plaintiff's apparent authority claim. Plaintiff personally selected Dr. Aaron Rosenberg as his orthopedic surgeon for his February 1998 knee surgery. This selection came in the wake of plaintiff's positive experience with Dr. Rosenberg during previous knee surgeries in August 1997 and September 1997, which themselves came after approximately three years of

conservative knee treatment that plaintiff received after becoming Dr. Rosenberg's patient in 1994. It is abundantly clear in this case that plaintiff sought care from Dr. Rosenberg, not from Rush, in scheduling his February 1998 knee surgery. Plaintiff testified that he would have gone to Dr. Rosenberg for his February 1998 surgery even if Dr. Rosenberg moved his practice to a hospital other than Rush. The majority's assertion that "it was only after plaintiff developed an interest in Rush, based upon his knowledge of the hospital and its staff, that he sought out a particular orthopedic surgeon at that institution" is inapposite. Slip op. at 39. The testimony the majority relies on to draw this conclusion pertains to plaintiff's initial decision to seek treatment from Dr. Rosenberg in 1994, not to plaintiff's decision to undergo his February 1998 knee surgery.

The fact plaintiff sought care from Dr. Rosenberg, not Rush, does not alone preclude plaintiff from recovering from Rush on the basis of Dr. El-Ganzouri's negligence. However, there is no indication in the record that plaintiff accepted treatment from Dr. El-Ganzouri because he assumed Dr. El-Ganzouri was not an independent contractor. Therefore, there is no basis for concluding that plaintiff's belief regarding Dr. El-Ganzouri's employment status had any effect on his decision to proceed with his treatment.

For the reasons expressed above, I would reverse the judgment of the appellate court, which affirmed the trial court's denial of Rush's motion for judgment notwithstanding the verdict.