**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210152-U

Order filed July 1, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| PEORIA ICE CREAM COMPANY, | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Peoria County, Illinois. |
| | ) | |
| v. | ) | |
| | ) | |
| EDMUND A. ZOSKY and IDEAL TROY | ) | Appeal No. 3-21-0152 |
| COMPANY, an Illinois corporation, | ) | Circuit No. 17-L-138 |
| | ) | |
| Defendants | ) | |
| | ) | |
| (Edmund A. Zosky, | ) | Honorable |
| | ) | Michael D. Risinger, |
| Defendant- Appellee). | ) | Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court.
Presiding Justice O'Brien concurred in the judgment.
Justice Holdridge dissented.

_____

**ORDER**

¶ 1    *Held*: (1) Trial court properly denied plaintiff's motion for judgment *n.o.v.* where jury instruction applying discovery rule to plaintiff's trespass claim accurately stated the law and did not mislead the jury;
(2) Trial court did not abuse its discretion in admitted expert testimony regarding diminution in value of plaintiff's property;

(3) Trial court's admission of witness's testimony regarding his wife was harmless error; and

(4) New trial is not warranted where jury's verdict was not contrary to the manifest weight of the evidence.

¶ 2    Plaintiff, Peoria Ice Cream Company (PIC), filed a tort liability suit against defendant, Edmond Zosky, alleging trespass and negligence for failing to remove and remediate environmental contaminates from its property. A jury returned a verdict in Zosky's favor on both claims. On appeal, PIC argues that the trial court erred in denying its motion for judgment notwithstanding the verdict (judgment *n.o.v.*) or a new trial on claim of trespass based on an improper jury instruction regarding the statute of limitations. Alternatively, PIC claims that: (1) the trial court abused its discretion in allowing Zosky's expert to testify regarding diminution in property value; (2) the trial court erred in allowing defense counsel to elicit irrelevant and prejudicial witness testimony; and (3) a new trial is warranted on the issue of damages because the jury's verdict was against the manifest weight of the evidence. We affirm.

¶ 3                                      I. BACKGROUND

¶ 4    PIC owns and operates a Dairy Queen restaurant in Peoria on property it purchased in 2014 (PIC property). Zosky owns property to the north of the PIC property, which includes a shopping center (Zosky property). The prior owner of the shopping center property, Ideal Troy Company (ITC), operated a dry cleaning business on the property from the 1950's to the mid-1970's. It is undisputed that ITC released hazardous chemicals during its operation that eventually migrated onto the PIC property.

¶ 5    In 2015, PIC hired ELM Energy, an environmental consulting firm, to inspect and test the PIC property as part of a Small Business Association (SBA) loan. ELM's inspection led to the discovery of chlorinated solvents and other volatile organic compounds in the subsoil in the northeast corner of the PIC property. Both parties agree that these environmental contaminants

2

originated from ITC's operation of the dry cleaning business and required remediation under Illinois Environmental Protection Agency (IEPA) regulations.

¶ 6 In April 2016, PIC, Zosky, and ITC entered into an agreement to voluntarily address the contamination. According to its terms, ITC and Zosky agreed to conduct remediation activities for the purpose of securing "a 'focused' No Further Remediation (NFR) letter (or letters) issued by the IEPA which confirms that *** no further remedial activities are necessary to prevent an unreasonable risk to human health and/or the environment caused by or arising from the [contaminants] identified beneath either Property." ITC and Zosky also agreed that they would submit the applications for both properties and retain an environmental consultant to complete the application process at their "sole cost and expense." The agreement specifically stated that PIC was not responsible for the expense of obtaining the NFR letters.

¶ 7 ITC submitted an SRP application to the IEPA on May 19, 2016. Zosky and ITC then hired an environmental consulting firm, Terracon, to develop a remediation plan for both properties in accordance with IEPA guidelines.

¶ 8 On May 19, 2017, PIC filed a complaint against Zosky and ITC, claiming that they failed to remediate the mitigation of environmental contaminants and seeking monetary damages for diminution in the value of its property and the cost of remediation. PIC's amended complaint contained four counts. Counts I and II alleged trespass and negligence against ITC. ITC filed for bankruptcy shortly after PIC filed its amended complaint; it successfully moved for dismissal of the counts against it. Counts III and IV alleged trespass and negligence against Zosky. Count III alleged that the continuous act of the contaminants migrating onto the PIC's property and Zosky's failure to remove the contaminants from the PIC property resulted in trespass and caused the value of the property to diminish. Count IV alleged that Zosky had a legal duty to remove the

3

contaminants from the PIC property and that he was negligent for failing to take adequate measures to remediate the contamination.

¶ 9    The IEPA issued an NFR letter for the PIC property on August 7, 2017, and another NFR letter for the Zosky property on August 25, 2017. The letters indicated that the properties had been "successfully investigated and/or remediated as required by law so that no further remedial activities are necessary to prevent an unreasonable risk to human health and/or the environment cause by or arising from the COC's identified beneath either property."

¶ 10    Prior to trial, PIC filed a motion *in limine* to bar the testimony of certified appraiser Paul Knight, challenging his testimony as to the impact of the environmental contaminants on the marketability of its property. PIC argued that Knight's testimony should be barred because he never appraised the property or reached any conclusion as to its value and he offered no factual basis for his conclusion that the PIC property suffered no diminution of value as a result of the presence of the contaminants. The trial court denied PIC's motion.

¶ 11    At trial, the following stipulated facts were read to the jury: (1) PIC has been the owner of the real property located at 4202 North Sheridan Road in Peoria since 2014; (2) Zosky has owned the shopping center property since 1977; (3) prior to Zosky's ownership of the Zosky property, ITC owned and operated a dry cleaning facility on the property; (4) ITC ceased operating a dry cleaning facility on the premises in the mid-1970's and sold the property to Zosky in 1977; (5) when Zosky purchased the property, ITC became a tenant and operated a customer drop-off/pick-up location on the property for apparel that it cleaned at another location; and (6) ITC has not used dry cleaning chemicals at the Zosky property location since Zosky purchased the property. The parties also stipulated that: (1) the environmental contaminants in the subsoil of the PIC property originated on the Zosky property as a result of ITC's release of environmental contaminants; (2)

4

at some point, the environmental contaminants released by ITC on the Zosky property began migrating onto the PIC property; and (3) the NFR letters issued by the IEPA were consistent with the parties' expectations when they entered into the April 2016 agreement.

¶ 12    Kurtis Freidag, the president of PIC, testified that the company operated a Dairy Queen restaurant on the PIC property since 1996. Freidag described the location of the property by referencing plaintiff's exhibit No. 1, a picture showing Lake Avenue and Sheridan Road. In the picture, an "Ideal Troy Cleaning" sign and a "Dairy Queen" sign are visible next to each other. Freidag testified that PIC leased the Sheridan Road Dairy Queen from 1996 to 2014 and purchased the property in 2014. At the time of purchase, Freidag was the president of the company. He was aware that ITC operated a drop-off/pick-up location for its dry cleaning business next door. He had no idea how long ITC had been operating its business at that location. He did not know that ITC operated a dry cleaning business on the Zosky property for 50 years.

¶ 13    Freidag testified that PIC demolished the old Dairy Queen building in the fall of 2014 and constructed a new restaurant that opened in the spring of 2015. He learned that the property was contaminated when PIC applied for an SBA loan after the new construction had been completed. During the application process, the bank raised questions about the neighboring dry cleaning business. Testing revealed hazardous chemicals around the area of the garbage dumpster. PIC hired ELM to obtain an NFR letter from the IEPA and secure SBA financing. Freidag further testified that it took PIC two years to obtain an NFR letter. He identified plaintiff's group exhibit No. 3, which contained the bills and invoices from ELM. The invoices, dated August 2015 through September 2017, totaled $5,718.75.

¶ 14    On cross-examination, Freidag stated that he started working for PIC in 2009 and became the president of the company in 2010. He was aware that ITC had a drop-off/pick-up location next

to the PIC property but did not know how long it had been there. Freidag identified Michael Kepple as the chief executive officer of the company, and Kepple's wife, Linda, as the secretary. He described Kepple as a sophisticated businessman who has been involved in commercial businesses for years. The bank that was handling the SBA loan for the PIC property required PIC to contact ELM before approving the loan. Freidag admitted that he supervised a new construction project for PIC at Grand Prairie four years earlier but noted that it did not involve an environmental contamination situation.

¶ 15    Kepple is the founder of PIC. He confirmed that the company began leasing the PIC property in 1996 and that he learned about the contamination after purchasing it in 2014. On cross-examination, Kepple testified he moved to Peoria in 1967, while attending Bradley University. From 1967 to 1996, he and his wife lived in Peoria. They moved to Dunlap in 1996. At that time, PIC owned the Dairy Queen on Farmington Road and leased Dairy Queen properties on Sheridan Road and Gale. PIC has been operating the Dairy Queen on the PIC property for 25 years. In 1996, he had some involvement in the operations of the Sheridan Road Dairy Queen. Kepple testified that he was unaware that ITC operated a dry cleaning business on the neighboring property.

¶ 16    In 2014, Kepple spoke with his attorney about the possibility of purchasing the PIC property. Zosky had already entered into a purchase agreement with the previous owners. Kepple paid the previous owners $25,000 and Zosky $25,000 to execute a release to sell the property to PIC. PIC paid $225,000 to purchase the property. Kepple immediately demolished the building on the site and constructed a new Dairy Queen restaurant for $1.2 million.

¶ 17    Kepple testified that Zosky and ITC agreed to hire an engineering firm and have that firm obtain NFR letters for both the PIC property and the Zosky property. The engineering firm

successfully obtained the letters, and PIC secured the SBA loan. ELM reviewed all of the work submitted by Terracon and never indicated that the remediation was unsatisfactory.

¶ 18    Kepple's wife, Linda, is a PIC officer and co-owner of the PIC property. She has no knowledge of the financial aspect of the business. She grew up in Peoria and has lived in Peoria since 1953. Kepple acknowledged that Linda owns the Keller Williams building in Peoria, along with several other properties, and that her father is Jack Pearl. He stated that he did not know if she was aware that ITC operated a dry cleaning business at the Sheridan Road location. Kepple then testified, over counsel's objection, that Linda had no experience with environmental remediation. Specifically, counsel asked if she had any experience with Phase 1 environmental remediation in purchasing commercial property. Kepple responded, "Not to my knowledge. She's not a commercial real estate agent, and, not to my knowledge."

¶ 19    Zosky testified that he purchased the neighboring property in 1977. At that time, no one was operating a dry cleaning business on the property. He did not know that ITC operated a dry cleaning facility on the property prior to 1977. Shortly after he purchased the Zosky property, he entered into a lease agreement with ITC to operate a drop-off and pick-up service at that location. He discovered that there were hazardous chemicals on his property that migrated to the PIC property in 2015 after ELM tested the site.

¶ 20    Craig Gocker, an environmental consultant with Ramboll USA, testified that the PIC property is contaminated with tetrachloroethylene, which is commonly referred to as "PERC." PERC was used for years in the dry cleaning business to remove dirt and oil from clothing. It degrades slowly over a "very long period of time" into a highly toxic chemical called vinyl chloride. Vinyl chloride was found on the PIC property in very low limits. Although active remediation could have been performed, no active methods were used to remove the chemicals on

either the PIC property or the Zosky property. On cross-examination, Gocker admitted that the IEPA was satisfied with the work performed on both properties and that the remediation barrier on the PIC property was approved by the IEPA. He admitted that it was rare for the IEPA to reopen an NFR letter.

¶ 21    Commercial appraiser Brad Glassey submitted an appraisal report and testified on PIC's behalf as to the impact the contamination had on the value of its property. Glassey's report applied the Detrimental Conditions Model (DCM) and appraised the value of the PIC property slightly below market value. He stated that an NFR letter has conditions and therefore presents additional risks to the property owner. He explained that a "stigma" from an environmental contamination is the negative effect on the value of the property even after property has been remediated. Glassey testified that since the IEPA can reopen remediation matters, property with an NFR letter suffers from a stigma that impacts the property's marketability. In this case, he believed that a stigma would apply because the contaminated area was in the corner of the concrete parking lot under a dumpster, which is an area that deteriorates more quickly due to the weight of the garbage trucks. The stigma deduction he assessed to the PIC property was a "measurable but small impact." Using the DCM, Glassey concluded that the contamination on the PIC property reduced the value of the property by approximately 5%, or between $50,000 and $75,000. On cross-examination, he acknowledged that he had not applied the DCM to any other commercial property he appraised. He used the model because he was unable to find a comparable property with an NFR letter to conduct a comparison-based appraisal.

¶ 22    In response, Zosky tendered a report written by Knight, evaluating Glassey's appraisal and assessing the impact of NFR letters on the value of commercial property in the Peoria area. Knight disagreed with Glassey's claim that the NFR letter in this case had a negative impact on the value

8

of the PIC property. Knight asserted that, based on his experience as an appraiser of commercial property, there was "no independent support that the stigma effect exists in the Greater Peoria commercial market." He concluded that there is "evidence that properties recently completing the remediation process have marketability, with no apparent diminution in value." He also reported no knowledge of any negative repercussions regarding the sale price of commercial property with an underlying NFR letter. Knight stated that he did not find any independent support for Glassey's claim that a stigma effect applied to commercial property in the Peoria area.

¶ 23　　Knight also testified as an opinion witness at trial. He stated that in preparation for this case he reviewed 71 properties in Peoria County for which NFR letters had been issued between 1999 and 2019 and found no evidence of a stigma effect on commercial property. He did not agree with the methodology Glassey used to estimate the value of the stigma in this case. Knight testified that his research failed to support the existence of a negative stigma based on an NFR letter. He appraises commercial properties with an NFR letter three to six times a year, inside and outside the Peoria area, and has not witnessed any evidence of a stigma effect. On cross-examination, Knight admitted that he did not conduct appraisals of any of the 71 properties he reviewed. His opinion of no stigma effect was based on his knowledge of the commercial real estate market in the Peoria area.

¶ 24　　Prior to deliberations, several instructions were submitted to the jury. Plaintiff's instruction No. 6 included statute of limitations language. Over PIC's objection, the trial court gave the following modified version of that instruction:

"In this case defendant has asserted, and has the burden of proving, that the Plaintiff is barred from bringing his claim for trespass because he failed to file the lawsuit within the statute of limitations.

9

Regarding the statute of limitations, the defendant contends that the plaintiff's lawsuit was not filed within the time set by law. To succeed on this defense, the defendant must prove that [ITC] stopped dumping contaminants on the defendant's property by at least May 18, 2012. However, if the plaintiff proves that it did not know and did not have reason to know of [ITC's] dumping on the contaminants on the defendant's Property on or before May 18, 2012, then the plaintiff's claim for trespass is deemed to be timely filed."

¶ 25 The jury returned a verdict in favor of Zosky on both counts. It also answered five special interrogatories as follows:

"1. Was it impossible to remove the environmental contaminants from the plaintiff's property? NO

2. Did the defendant's failure to remove the environmental contaminants from the plaintiff's property cause the plaintiff to sustain damages? NO

3. Did the plaintiff know on or before May 19, 2012[,] that the plaintiff's property was contaminated with environmental contaminants? NO

4. Should the plaintiff have reasonably known on or before May 19, 2012[,] that the plaintiff's property was contaminated with environmental contaminants? YES

5. Did the plaintiff prove that the value of its property has been diminished as a result of the defendant's failure to remove environmental contaminants from the plaintiff's property? NO"

¶ 26 PIC filed a posttrial motion for judgment *n.o.v.* on the issue of liability for count III, arguing that the trespass claim was not subject to the statute of limitations and the modified jury instruction was inappropriate. In the alternative, PIC asked for a new trial on both counts, claiming that the

jury's verdict was contrary to the manifest weight of the evidence. The trial court denied the motion.

¶ 27                                    II. ANALYSIS

¶ 28                                  A. Judgment *N.O.V.*

¶ 29         PIC claims that the trial court erred in denying its motion for judgment *n.o.v.* as to count III because the jury instruction regarding the statute of limitations was a "clear misstatement of the law." PIC argues that because count III alleges trespass based on Zosky's *failure to remove* the environmental contaminants from its property, reference to ITC's *dumping* in the instruction resulted in serious prejudice and entitles it to judgment *n.o.v.* or, alternatively, a new trial as to liability on count III.

¶ 30         Judgment *n.o.v.* is only warranted in those limited cases when " 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand.' " *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 178 (2006) (quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)). The standard is a high one, and judgment *n.o.v.* is inappropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented at trial. *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351 (1995). Our standard of review is *de novo*. *York*, 222 Ill. 2d at 178.

¶ 31         In contrast, on a motion for a new trial, the trial court will weigh the evidence and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). A verdict is against the manifest weight of the evidence only where the opposite result is clearly evident or where the jury's findings are "unreasonable, arbitrary and not based upon any of the evidence." *Id.* This court will not reverse the trial court's ruling on a motion

11

for a new trial unless it is affirmatively shown that the trial court abused its discretion. *Id.* at 455. When reviewing a trial court's decision on a motion for a new trial, the reviewing court should remember the trial court had the opportunity to personally observe witness testimony. *Id.* at 456.

¶ 32     The decision to grant or deny a jury instruction is generally within the discretion of the trial court. *Hobart v. Shin*, 185 Ill. 2d 283, 294 (1998). "The standard for determining an abuse of discretion is whether, taken as a whole, the instructions are sufficiently clear so as not to mislead and whether they fairly and correctly state the law." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002). However, when the question is how accurately the applicable law was conveyed, the issue is a matter of law, and our review is *de novo*. *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶ 13. "A reviewing court ordinarily will not reverse a trial court for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp*, 201 Ill. 2d 260, 274 (2002).

¶ 33     To prevail on a trespass claim, a plaintiff must plead and prove negligent or intentional conduct by the defendant, which has resulted in an intrusion on the plaintiff's property. *Porter v. Urbana-Champaign Sanitary District*, 237 Ill. App. 3d 296, 303 (1992) (citing *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 556-57 (1980)). Section 161(2) of the Restatement (Second) of Torts provides:

> "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor's predecessor in legal interest therein has tortuously placed there, if the actor, having acquired his legal interest in the thing with knowledge of such tortious conduct or having thereafter learned of it, fails to remove the thing." Restatement (Second) of Torts § 161(2) (1965).

12

If a trespass is continuing, any person in possession of land at any time during its continuance may maintain a cause of action. *Rosenthal v. City of Crystal Lake*, 171 Ill. App. 3d 428, 435-36 (1988).

¶ 34 A continuing tort "is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278-79 (2003); *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill. App. 3d 757, 763 (1991). "[M]erely owning a piece of contaminated land is not alone enough, since such 'conduct' does not cause the nuisance or trespass—the alleged injuries would occur whether or not [d]efendants owned the [s]ite." *Village of DePue v. Viacom International, Inc.*, 713 F. Supp. 2d 774, 778 (C.D. Ill. 2010). Moreover, simply pointing to the migration of hazardous substances is not enough. *Village of DePue v. Viacom International, Inc.*, 632 F. Supp. 2d 854, 865 (C.D. Ill. 2009) (migration of hazardous substances did not amount to negligent or intentional conduct by the defendant; allegation was insufficient to state a claim for trespass because it did not allege tortious conduct by the defendant); see also *Powell v. City of Danville*, 253 Ill. App. 3d 667, 669 (1993) (final tortious act for purpose of trespass claim was when last toxic dump took place; while the effects may be continuing due to leaching, the tortious act ceased years earlier).

¶ 35 Here, PIC argues that the continuing tort doctrine applies based on Zosky's failure to remove the environmental contamination from the PIC property. We disagree. In cases where the tortious activity ceased at a certain date, courts do not apply the continuing tort doctrine because to do so would "confuse the concept of continuing tort with that of continuing injury." *Powell*, 253 Ill. App. 3d at 667. Contrary to PIC's argument, Zosky's failure to remove the contamination is not the continuing tort in this case; the tortious activity is the release of hazardous chemicals by ITC.

13

¶ 36    Prior to trial, the parties stipulated that the environmental contaminants found on the PIC property originated from the Zosky property as a result of ITC's release of hazardous chemicals. The uncontested evidence at trial demonstrated that ITC stopped using and releasing hazardous chemicals on the Zosky property prior to 1977. Thus, the final tortious act for purposes of PIC's trespass claim occurred in the 1970's. PIC did not file its claim until May 19, 2017. The statute of limitations therefore bars PIC claim unless it can establish that the discovery rule applies.

¶ 37    The discovery rule delays commencement of the statute of limitations and starts it at the point when the plaintiff becomes possessed of sufficient information concerning the injury and its cause so that a reasonable person would be put on notice to determine whether actionable conduct was involved. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 415-16 (1981). Under the discovery rule, the statute starts to run when a plaintiff knows or reasonably should know of an injury and knows or reasonably should know that it was wrongfully caused. *Id.* at 415. When a plaintiff uses the discovery rule to postpone the start of the statute of limitations, the burden is on the plaintiff to prove the date of discovery. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 85 (1995).

¶ 38    In this case, it was PIC's burden to establish that it neither knew nor should have known that the dry cleaning facility released hazardous chemicals that migrated onto its property on or before May 18, 2012, to avoid application of the statute of limitations. The language utilized in the jury instruction did not deviate from that legal standard. The trial court's modified instruction clearly stated the legal principle that PIC was required to show that it did not know or should not have known the ITC released environmental contaminants that migrated onto its property more than five years from the filing date of the complaint. It accurately stated the law and did not mislead the jury.

¶ 39    Moreover, the jury's ultimate ruling in favor of Zosky on count III was based on the totality of the evidence presented at trial. Freidag and Kepple both testified that PIC had been operating a Dairy Queen on property adjacent to a dry cleaning business for more than 20 years, and pictures showed the Dairy Queen sign and the Ideal Troy sign next to each other, clearly visible from Sheridan Road. Freidag stated that he had been the president of the company, overseeing daily operations, since 2010. Kepple testified that he moved to Peoria in 1967 and had lived in the Peoria area since that time. Further, he stated that he formed PIC in 1994 and began leasing the PIC property and other Dairy Queen properties in 1996. Kepple also stated that he owned several commercial properties and operated two other businesses in Peoria. Freidag even described Kepple to the jury as a sophisticated businessman. Testimony further established that PERC was widely used in the dry cleaning industry and was an extremely hazardous environmental contaminant. From this evidence, the jury could have reasonably inferred that, based on Kepple commercial real estate knowledge and the proximity of the PIC property to the dry cleaning facility, PIC knew or should have known that the property was contaminated with hazardous chemicals

¶ 40    Viewing the facts in the light most favorable to Zosky, we cannot conclude that the evidence so overwhelmingly favors PIC that no contrary verdict based on that evidence could ever stand. See *York*, 222 Ill. 2d at 178. There was sufficient evidence to support the jury's finding and the trial court did not err in denying PIC's motion for judgment *n.o.v.* We also agree with the trial court's determination that the jury's finding that PIC should have known that its property was contaminated prior to May 19, 2012, was not against the manifest weight of the evidence. The trial court did not abuse its discretion in denying PIC's motion for a new trial as to the issue of liability on count III.

¶ 41                    B. Trial Court's Evidentiary Rulings

### 1. *Knight's Opinion Testimony*

¶ 42    PIC claims that the trial court abused its discretion in admitting Knight's opinion testimony because his assessment of the PIC property was not based on a reasonable degree of certainty within the field of his expertise.

¶ 43    A witness will be allowed to testify as an expert if his or her experience and qualifications afford him or her knowledge that is not common to a layperson. *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 26 (2008). In other words, expert opinion testimony is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field and the testimony would assist the jury in understanding the evidence. *Petraski v. Thedos*, 382 Ill. App. 3d 22, 28 (2008).

¶ 44    An expert's opinion, however, is only as valid as the reasons for the opinion, and a party must lay a foundation sufficient to establish the reliability of the basis for the expert's opinion. *Yanello v. Park Family Dental*, 2017 IL App (3d) 140926, ¶ 44. An expert's testimony must be to a reasonable degree of certainty within the field of his or her expertise to be admissible. *Torres*, 292 Ill. App. 3d at 28.

¶ 45    The decision whether to admit testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Daniels v. ArvinMeritor, Inc.*, 2019 IL App (1st) 190170, ¶ 36. A court abuses its discretion if the trial court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would agree with its position. *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 9 (2007). In determining whether there has been an abuse of discretion, the appellate court does not substitute its own judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely. *Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 61.

¶ 46     Here, the trial court did not abuse its discretion in allowing Knight to testify regarding the methods used by Glassey to determine a diminution in value of the PIC property. In Glassey's appraisal report and during his testimony, Glassey opined that there were no relevant recorded NFR letters that would allow him to apply the sales comparison approach to determine the PIC property's fair market value. Knight, however, testified that he was able to find 71 properties with NFR letters in the Peoria area, and he used those properties to evaluate the potential impact of NFR letters on the market value of the corresponding properties. Using that data, he testified that properties that were involved in the IEPA remediation process still had marketability with no apparent diminution in value. Based on Knight's expertise as an appraiser in the commercial real estate market, his opinion that properties with NFR letters are marketable was reliable and the rationale for his opinion was supported by facts. Moreover, his assessment of comparable sales of multiple NFR letter properties provided a factual basis for his testimony and assisted the jury in understanding the evidence.

¶ 47     In its motion *in limine* and at trial, PIC did not assert that Knight was not qualified to testify regard the appraised value of the PIC property. Instead, PIC attacked his report and his testimony on the ground that Knight failed to appraise the PIC property. However, Knight's opinion testimony was not offered at trial to provide an appraised value of the PIC property, it was offered in opposition to Glassey's opinion that the NFR letter issued for the PIC property had a "stigma" effect that diminished the market value of the property. It was offered to attack Glassey's application of the DCM to his market value calculation, to challenge Glassey's assertion that there were no comparable contaminated properties in the area, and to rebut Glassey's opinion that a negative stigma effect should be applied. Thus, although Knight did not conduct an appraisal of the PIC property, his experience, knowledge, and skill as an expert in commercial real estate

17

qualified him to testify regarding Glassey's market evaluation of the PIC property. We find no abuse of discretion in the court's decision to allow his testimony at trial.

¶ 48                                2. *Kepple's Testimony Regarding his Wife*

¶ 49        PIC also argues that the trial court erred in overruling its objection to Kepple's testimony, elicited on cross-examination, regarding his wife's real estate experience.

¶ 50        Although litigants are assured a fair trial, they are not guaranteed a perfect one. *Department of Transportation v. Dalzell*, 2018 IL App (2d) 160911, ¶ 127. Consequently, an evidentiary error does not necessarily require reversal, as the error may be harmless. *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 429 (2009). Harmless error occurs when, despite the presence of an error, "the reviewing court can see from the entire record that no harm has been done." *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991). On the other hand, reversible error occurs when an error "appears to have affected the outcome of the trial." *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 28.

¶ 51        At trial, Kepple testified that he was the owner and former president of PIC and that his wife, Linda Kepple, was a co-owner and officer of the company. He also testified that Linda was born and raised in Peoria. PIC suggests on appeal that Kepple's testimony inappropriately revealed that Linda was a real estate agent. On cross-examination, defense counsel asked Kepple if his wife had any experience with environmental remediation. Kepple responded, "Not to my knowledge. She's not a commercial realtor." Kepple briefly discussed his wife's limited participation in the company and cross-examination ended. No other line of questioning mentioned her occupation, and she did not testify. Accordingly, the trial court did not err in admitting Kepple's brief testimony regarding her experience.

18

¶ 52    Even if an error occurred, we conclude it was harmless. The jury found that PIC should have known that its property was contaminated on or before May 19, 2012. As we have determined, that finding was sufficiently supported by Freidag's and Kepple's testimony. Moreover, there is no evidence in the record that Kepple's testimony regarding his wife's lack of commercial real estate experience affected the jury's determination that PIC had reason to know about the contamination before May 2012.

¶ 53                          C.  New Trial on the Issue of Damages

¶ 54    Last, PIC argues that the cause should be remanded for a new trial on the issue of damages. It claims that the jury's findings that Zosky's negligence did not diminish the value of the property and did not cause PIC to sustain damages were against the manifest weight of the evidence.

¶ 55    The assessment of damages is a question of fact for the jury to determine. *Snelson v. Kamm*, 204 Ill. 2d 1, 36 (2003). Thus, a damage award is particularly within the jury's discretion, and courts are reluctant to interfere with the jury's decision. *Id.* at 36-37. On review, a jury's award of damages will not be disturbed "unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Gill v. Foster*, 157 Ill. 2d 304, 315 (1993).

¶ 56    Here, the evidence presented by PIC as to damages was not uncontroverted. Expert opinion testimony was provided on both sides. Glassey's testimony that a 5% stigma reduction was appropriate did not mean that the jury was required to ignore Knight's testimony, which established that the NFR letter did not have a negative impact on the market value of the PIC property. Additionally, while there is no dispute that PIC incurred costs associated with hiring ELM to work on obtaining the NFR letter, the stipulated facts established that the parties entered into an agreement pursuant to which the NFR letters were to be obtained. The agreement, which

19

was also provided to the jury, stated that Zosky and ITC were solely responsible for the expenses associated with obtaining NFR letters for both properties. The terms of the agreement established that it was Terracon's responsibility to obtain the NFR letters. Moreover, testimony from Freidag and Kepple demonstrated that PIC hired ELM to oversee the remediation process with the IEPA and to ensure that Terracon performed its duties satisfactorily. Kepple testified ELM reviewed all the work submitted by Terracon and never indicated that it was unsatisfactory. No one testified that the ELM expenses were required to obtain the NFR letter for the PIC property. Thus, the jury could have reasonably inferred that the expenses for work ELM performed after the environmental contamination was discovered were duplicative and unnecessary. Accordingly, the jury's findings were supported by the evidence, and a new trial on the issue of damages is not warranted.

¶ 57                                    III. CONCLUSION

¶ 58        The judgment of the circuit court of Peoria County is affirmed.

¶ 59        Affirmed.

¶ 60        JUSTICE HOLDRIDGE, dissenting:

¶ 61        I respectfully dissent from the majority's offering. Instead, I would find that the jury's determination that the plaintiff should have known about the presence of the contaminants on or before May 19, 2012, was against the manifest weight of the evidence. It was undisputed that no dry-cleaning activities occurred on the defendants' property after 1977. The plaintiff did not begin operating a Dairy Queen restaurant on the neighboring property until 1996. The plaintiff had no reason to know what chemicals the dry cleaners had used almost 30 years previously, nor did they have any reasons to believe that the defendants had improperly disposed of or mishandled the chemicals in such a way that would cause contamination on the plaintiff's property. Moreover, I cannot find that the plaintiff had any duty to test for any contamination on the property. Between

20

1996 and 2014, the plaintiff solely leased the property. Even if such testing would be standard procedure before buying the property, the plaintiff did not purchase the property until 2014. Thus, any due diligence required before purchasing the property would not have revealed the presence of any contamination until well after the May 19, 2012, statute of limitations date. As I would find that such a determination was against the manifest weight of the evidence, I would reverse and remand for a new trial, as the plaintiff requests.